Joseph R. Becerra (State Bar No. 210709)
LAW OFFICE OF JOSEPH R. BECERRA
835 Wilshire Boulevard, Suite 200
Los Angeles, California 90017
Telephone:     (213) 542-8501
Facsimile:      (213) 542-5556
Email: jbecerra@jrbecerralaw.com

TOREY JOSEPH FAVAROTE State Bar No.: 198521
GLEASON & FAVAROTE, LLP
835 Wilshire Blvd., Suite 200
Los Angeles, California 90017
Telephone:     (213) 452-0510
Facsimile:      (213) 452-0514
tfavarote@gleasonfavarote.com

Attorneys for Plaintiff Portia Daniels,
on behalf of herself and all others similarly
situated

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| Portia Daniels, on behalf of herself and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>AÉROPOSTALE WEST, INC., a Delaware corporation, AÉROPOSTALE, INC., a Delaware corporation, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. CV 12-05755 WHA<br><br>**DECLARATION OF TOREY J. FAVAROTE IN SUPPORT OF PLAINTIFF'S MOTION FOR ORDER GRANTING CONDITIONAL CERTIFICATION OF FLSA COLLECTIVE ACTION AND FOR ORDER REGARDING MAILING OF OPT-IN NOTICE TO FLSA COLLECTIVE ACTION MEMBERS**<br><br>Action Filed:     November 9, 2012<br>Trial Date:        None |

- 1 -

DECLARATION OF TOREY JOSEPH FAVAROTE
IN SUPPORT OF MOTION FOR CONDITIONAL COLLECTIVE FLSA CERTIFICATION
**Case No. CV 12-05755 WHA**

## DECLARATION OF TOREY JOSEPH FAVAROTE

I, TOREY JOSEPH FAVAROTE, declare that:

1.     I am an attorney at law duly licensed to practice before all courts of the State of California, and before this Court. I am a partner at Gleason & Favarote LLP, attorneys of record for plaintiff Portia Daniels. I have responsibility for the handling of this matter. I have personal knowledge of the facts stated herein, and would and could testify competently thereto if sworn as a witness.

2.     I drafted the proposed notice of collective action and opt-in form to be sent to the FLSA Collective Action Members. Attached hereto as **Exhibit "1"** is a true and correct copy of the proposed collective action notice and opt-in form that we request approval of should the Court grant Plaintiff's Motion for Conditional Class Certification.

3.     I ran a search of Defendants' business, online and found through Defendants' website "About Aeropostale Inc." a summary of the Defendants' business and locations. Attached hereto as **Exhibit "2"** is a true and correct copy of the "About Aeropostale, Inc." webpage. On Defendants' website it shows that Defendants have approximately 914 stores in the United States, and has at least one store in each state as well as Puerto Rico.

4.     On or about March 16, 2011, a lawsuit was filed against Defendants entitled La Tina Sankey v. Aeropostale West Inc., and Aeropostale Inc., BC 457468 in Los Angeles Superior Court, Judge Richard L. Fruin presiding (the "Sankey" matter). The Sankey lawsuit alleged the same conduct at issue in this case for failure to include non-discretionary bonuses in the calculation of non-exempt employees' overtime in violation of state law. The Sankey case was certified as a proper class action on December 21, 2012.

5.     On January 13, 2012, the deposition of Rawle Boatswain was taken by my co-counsel, Mr. Joseph R. Becerra of the Law Office of Joseph R. Becerra. Mr. Boatswain was designated by Defendants as the person most knowledgeable regarding "[t]he practices and procedures followed by Aeropostale in calculating overtime pay on all bonuses paid to Store Managers and/or Assistant Store Managers . . ." in the Sankey matter. Subsequently, I am informed and believe that the certified

1   Court Reporter transcribed Boatswain's deposition testimony and my office received copies of the

2   transcripts of the testimony taken during Boatswain's deposition. Attached hereto as **Exhibit "3"** is a

3   true and correct cover page (identifying the civil action and the deponent), excerpts of the deposition

4   transcripts volume 1 prepared by the court reporter and the court reporter's certificate.

5         6.     On May 7, 2012, the deposition of Mr. Boatswain was taken by Mr. Becerra. This

6   second deposition of Mr. Boatswain was taken as a result of Defendants, once again, designating Mr.

7   Boatswain as the person most knowledgeable regarding their payroll practices in the <u>Sankey</u> matter.

8   Subsequently, I am informed and believe that the certified Court Reporter transcribed Boatswain's

9   deposition testimony and my office received copies of the transcripts of the testimony taken during

10   Boatswain's deposition. Attached hereto as **Exhibit "4"** is a true and correct cover page (identifying

11   the civil action and the deponent), excerpts of the deposition transcripts volume 2 prepared by the

12   court reporter and the court reporter's certificate.

13         7.     In the course of discovery for the <u>Sankey</u> matter, it was discovered that Defendants

14   sent out letters to their then currently employed Store Managers and Assistant Store Managers, all of

15   whom are classified by Defendants as non-exempt employees, stating that their overtime pay had

16   been "under calculated." In addition to the correspondence sent to each nonexempt, currently

17   employed employee, Defendants provided each under paid employee with a specific spreadsheet

18   calculating the proper overtime "make-up" payment. In all, Defendants sent out approximately 160

19   letters and "make up" overtime payments to then currently employed nonexempt employees.

20   Attached hereto as **Exhibit "5"** is a true and correct copy of one of Defendants' March 22, 2012 letter

21   to employees.

22         8.     Additionally, during the course of discovery for the <u>Sankey</u> matter, Defendants

23   provided verified responses to plaintiff's Special Interrogatories, Set Four. Attached hereto as

24   **Exhibit "6"** is the cover page, Defendant's relevant responses to Special Interrogatories nos. 97 & 99

25   and Defendant's verification. In these discovery responses, Defendants' affirm that all "store line

26   employees" receive non-discretionary bonuses.

27   / / /

28

**DECLARATION OF TOREY JOSEPH FAVAROTE
IN SUPPORT OF MOTION FOR CONDITIONAL COLLECTIVE FLSA CERTIFICATION**
**Case No. CV 12-05755 WHA**

1    I declare under penalty of perjury under the laws of the United States of America and the

2 State of California that the foregoing is true and correct, and that this declaration is made and

3 executed on this 7th day of March 2013, at Los Angeles, California.

4

5                                          /s/ Torey J. Favarote
                                           Torey Joseph Favarote
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF TOREY JOSEPH FAVAROTE**
**IN SUPPORT OF MOTION FOR CONDITIONAL COLLECTIVE FLSA CERTIFICATION**
**Case No. CV 12-05755 WHA**

**PROOF OF SERVICE**

I, Torey J. Favarote, declare:

I am and was at the time of the service mentioned in this declaration, employed in the County of Los Angeles, California. I am over the age of 18 years and not a party to the within action. My business address is Gleason & Favarote, LLP, 835 Wilshire Blvd., Suite 200, Los Angeles, CA 90017.

On March 7, 2013, I served a copy(ies) of the following document(s):
**DECLARATION OF TOREY J. FAVAROTE IN SUPPORT OF PLAINTIFF'S MOTION FOR ORDER GRANTING CONDITIONAL CERTIFICATION OF FLSA COLLECTIVE ACTION AND FOR ORDER REGARDING MAILING OF OPT-IN NOTICE TO FLSA COLLECTIVE ACTION MEMBERS**

on the parties to this action by placing them in a sealed envelope(s) addressed as follows:

| Attorney | Party(ies) Served | Method of Service |
|---|---|---|
| Stacey D. McKee-Knight, Esq.<br>Rachel Schumacher, Esq.<br>Robert J. Dwyer, Esq.<br>Katten Muchin Rosenman, LLP<br>2029 Century Park East, Suite 2600<br>Los Angeles, CA 90067-3012<br>rachel.schumacher@kattenlaw.com<br>stacey.knight@kattenlaw.com<br>robert.dwyer@kattenlaw.com | Counsel for Defendants | CM/ECF SYSTEM |

☐ [BY MAIL] I placed the sealed envelope(s) for collection and mailing by following the ordinary business practice of Gleason & Favarote, LLP, Los Angeles, California. I am readily familiar with Gleason & Favarote, LLP's practice for collecting and processing of correspondence for mailing with the United States Postal Service, said practice being that, in the ordinary course of business, correspondence with postage fully prepaid is deposited with the United States Postal Service the same day as it is placed for collection.

☐ [BY OVERNIGHT COURIER] I caused the sealed envelope(s) to be delivered by a commercial carrier  service for overnight delivery to the offices of the addressee(s).

☐ [BY HAND] I directed the sealed envelope(s) to the party(ies) so designated on the service list to be delivered by courier this date.

☐ [BY FACSIMILE TRANSMISSION] I caused said document to be sent by facsimile transmission to the fax number indicated for the party(ies) listed above.

☐ [BY ELECTRONIC TRANSMISSION] I caused said document to be sent by electronic transmission to the e-mail address indicated for the party(ies) listed above.

☒ [BY CM/ECF SYSTEM] I caused the above-referenced document(s) to be sent by electronic transmittal to the Clerk's Office using the CM/ECF System for filing which generated a Notice of Electronic Filing to the CM/ECF registrants in this case.

1

2          I declare under penalty of perjury under the laws of the State of California that the above is

3    true and correct, and that this declaration was executed on March 7, 2013, at Los Angeles, California.

4

5                                              /s/ Torey J. Favarote
                                                  Torey J. Favarote

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

# EXHIBIT 1

**[IMPORTANT NOTICE REGARDING YOUR RIGHTS]**

**NOTICE OF COURT CERTIFICATION OF COLLECTIVE ACTION IN FEDERAL OVERTIME LAWSUIT AGAINST AÉROPOSTALE WEST INC., AND AÉROPOSTALE, INC.**

*Portia Daniels v. Aéropostale West Inc., and Aéropostale, Inc.*
U.S. District Court for the Northern District of California

TO:   ALL NON-EXEMPT EMPLOYEES EMPLOYED BY AÉROPOSTALE WEST INC., AND/OR AÉROPOSTALE INC. IN THE UNITED STATES AND PUERTO RICO FROM NOVEMBER 9, 2009 TO THE PRESENT.

## I.   INTRODUCTION

You have received this Notice because Aéropostale West Inc. and Aéropostale Inc. records indicate that you may be eligible to join a collective action lawsuit for the alleged failure to pay federal overtime entitled *Daniels v. Aéropostale West Inc., and Aéropostale, Inc.* 3:12cv05755 (WHA) (the "Lawsuit"). The Lawsuit is filed in the U.S. District Court for the Northern District of California.

The Lawsuit alleges that Aéropostale West Inc., and Aéropostale Inc. improperly denied Non-Exempt Employees (those earning overtime pay) overtime wages as required by federal law (the Fair Labor Standards Act). Aéropostale West Inc. and Aéropostale Inc. contests all claims that have been asserted and deny any wrongdoing or liability. The Court certified the Lawsuit to proceed as a "collective action" on behalf of all Non-Exempt Employees who were employed by Aéropostale West Inc., and/or Aéropostale Inc. in the United States and Puerto Rico from November 9, 2009 to the present.

**This Notice and its contents have been authorized by the U.S. District Court for the Northern District of California. However, the Court has <u>not</u> yet expressed any opinion about the merits of the claims asserted or the defenses raised, and you should <u>not</u> interpret the sending of this Notice as any indication of the Court's opinion of the ultimate outcome of this Lawsuit.**

## II.   YOUR RIGHT TO PARTICIPATE IN THE LAWSUIT

If you fit the Non-Exempt Employee definition above, you may join the Lawsuit by completing and mailing the attached "Consent to Join" form at the following address, in the enclosed self addressed envelope with pre-paid postage:

**[INSERT CLAIM ADMIMINISTRATOR CONTACT INFORMATION]**

EXHIBIT 1 PAGE 1

**TO JOIN THIS LAWSUIT, YOU <u>MUST</u> SIGN, DATE, AND MAIL THE "CONSENT TO JOIN" FORM.  IF THE FORM IS NOT TURNED IN 60 DAYS FROM THE MAILING DATE, _____, 2013, YOU WILL <u>NOT</u> BE A PART OF THIS LAWSUIT.**

Without sending the "Consent to Join" form, you are not automatically a party to this Lawsuit, nor are you required to become a party.

### III.    EFFECT OF JOINING THIS LAWSUIT

If you choose to join this Lawsuit, you might be required to provide information relevant to the Lawsuit.  If you join the Lawsuit, you will be bound by the judgment or settlement, whether it is favorable or unfavorable.  Further, if you join the Lawsuit, you designate the collective action representatives as your agents to make binding decisions on your behalf concerning the litigation.

#### Counsel for Plaintiffs

If you choose to join this Lawsuit and agree to be represented by the named Plaintiff through her attorneys, your counsel in this case will be the Law Office of Joseph R. Becerra and Gleason & Favarote LLP.

Alternatively, you may join this Lawsuit and retain counsel of your own choosing at your own expense.  If you wish to retain your own counsel, your attorney must file your "Consent to Join" form with the Court within **60 DAYS FROM THE MAILING DATE,** _____, 2013 and enter an appearance.

### IV.    IF YOU CHOOSE NOT TO JOIN THIS LAWSUIT

If you choose not to join the collective action, you will not be affected by any judgment rendered or settlement reached in this case.  Further, you will be free to file your own lawsuit in any court where such a lawsuit may properly be brought.  You do not have to complete and mail the "Consent to Join" form if you do not wish to join this Lawsuit.

### V.    NO RETALIATION IS PERMITTED

Federal law prohibits anyone from discriminating or retaliating against you for joining or deciding not to join in this Lawsuit.

### VI.    FURTHER INFORMATION

If you have questions about this Notice, the Consent to Join Form, or the Lawsuit generally, you may contact Plaintiff's counsel, Joseph R. Becerra of the Law Office of Joseph R. Becerra, or Torey Joseph Favarote of Gleason & Favarote LLP at:

2

EXHIBIT 1 PAGE 2

Joseph R. Becerra, Esq.                        Telephone: (213) 542-8501
Law Office of Joseph R. Becerra                Facsimile: (213) 542-5556
835 Wilshire Boulevard, Suite 200              jbecerra@jrbecerralaw.com
Los Angeles, CA 90017

OR

Torey Joseph Favarote, Esq.                    Telephone: 213-452-0510
Gleason & Favarote LLP                         Facscimile:213-452-0514
835 Wilshire Boulevard, Suite 200              tfavarote@gleasonfavarote.com
Los Angeles, CA 90017

**Please do not contact the Court or the Court clerk with questions about this Lawsuit.**

EXHIBIT 1 PAGE 3

## CONSENT TO JOIN FORM
Consent to join under the Fair Labor Standards Act

**THIS FORM MUST BE TURNED IN *60 DAYS FROM THE MAILING DATE,* _____, *2013* OR YOU WILL NOT BE A PART OF THIS LAWSUIT**

I work or worked for Aéropostale West Inc., and/or Aéropostale Inc., in the United States as a non-exempt employee.

I consent to join the Fair Labor Standards Act collective action entitled *Portia Daniels v. Aéropostale West Inc., and Aéropostale Inc.*, 3:12cv05755 (WHA) to recover unpaid overtime wages under the federal Fair Labor Standards Act, 29 U.S.C. §216 (b).

I choose to be represented in this matter by the named Plaintiff and counsel (Law Office of Joseph R. Becerra and Gleason & Favarote LLP) in this action.

Name: _____

Address: _____
        Number/Street

        _____
        City            State        Zip Code

Telephone: (\_\_\_) _____  Email: _____

Signature: _____  Dated: _____

*Please return in the accompanying postage pre-paid envelope to:*

**[INSERT CLAIMS ADMINISTRATOR CONTACT INFORMATION]**

EXHIBIT 1 PAGE 4

# EXHIBIT 2

my account   track order   help   store locator   shipping to: 🏳️                    0 items $0.00

keyword or item #   🔍

About Aéropostale
Careers
FAQs
Investor Relations
Store Locator

## AÉROPOSTALE



### ABOUT AÉROPOSTALE, INC.

Aéropostale, Inc. is a mall-based, specialty retailer of casual apparel and accessories, principally targeting 14 to 17 year-old young women and men through its Aéropostale® stores and 4 to 12 year-old kids through its P.S. from Aéropostale™ stores. The Company provides customers with a focused selection of high-quality, active-oriented, fashion and fashion basic merchandise at compelling values. Aéropostale® maintains control over its proprietary brands by designing, sourcing, marketing and selling all of its own merchandise. Aéropostale® products can only be purchased in its Aéropostale stores and online at www.Aéropostale.com. P.S. from Aéropostale™ products can be purchased in P.S. from Aéropostale™ stores and online at www.ps4u.com. The Company currently operates 914 Aéropostale® stores in 50 states and Puerto Rico, 75 Aéropostale stores in Canada and 97 P.S. from Aéropostale® stores in 22 states. In addition, pursuant to various licensing agreements, our licensees currently operate 20 Aéropostale® and P.S. from Aéropostale® stores in the Middle East, Asia and Europe.

### ABOUT P.S. FROM AÉROPOSTALE™

The new P.S. from Aéropostale™ brand offers trend-right merchandise at compelling values for girls and boys ages four to twelve. The P.S. from Aéropostale store provides an experience that is cool for kids and enjoyable for parents. The Company currently operates 97 P.S from Aéropostale stores in 22 states. P.S. from Aéropostale products can only be purchased in its stores or online through its e-commerce website ps4u.com.

SIGN UP FOR EMAIL 🔒   |   Like 8.7m

EXHIBIT 2 PAGE 1

# EXHIBIT 3

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                COUNTY OF LOS ANGELES

3

4    LA TINA SANKEY, on behalf of

     herself and all others

5    similarly situated,

6              Plaintiffs,

7         vs.                        No.  BC457468

8    AEROPOSTALE WEST, INC., a

     Delaware corporation,

9    AEROPOSTALE, INC., a Delaware

     corporation, and DOES 1 through

10   10, inclusive,

11             Defendants.

12   _____

13

14

15      VIDEOTAPED DEPOSITION OF RAWLE BOATSWAIN

16            Los Angeles, California

17           Friday, January 13, 2012

18                  Volume 1

19

20

21   Reported by:

     GINA CANGIAMILA

22   CSR No. 10256

23   Job No. CA128974

24

25   PAGES 1 - 204

                                    Page 1

EXHIBIT 3 PAGE 1

1    Q.  Do you know if Ms. Canovas is still employed by    11:07:00

2    Polo Ralph Lauren?

3    A.  I can't answer that question, honestly.

4    Q.  Do you know if Polo Ralph Lauren paid bonuses    11:07:31

5    to its employees?

6    A.  Yes.

7    Q.  Do you know if Polo Ralph Lauren paid overtime

8    on those bonuses?

9    A.  I can't recall that.  Sorry.

10    Q.  Do you know if that was an issue in the Otsuka

11    case at all?

12    A.  Can you repeat the question?

13    Q.  Sure.  Do you know if the issue of overtime

14    paid on bonuses was part of the Otsuka litigation?

15    A.  As I indicated to you earlier, I can't remember    11:07:59

16    the specifics of the Otsuka case.

17    Q.  Fair enough.  How long have you held your

18    current position as the Director of Payroll for

19    Aeropostale?

20    A.  April 2010.

21    Q.  And just looking at Exhibit Number 2 just for a

22    moment again, just so I've got a clear record, is there

23    anything on here that's not accurate?    11:08:28

24    A.  Not at all.

25    MS. GLOUSMAN:  Do you want to just --

Page 49

EXHIBIT 3 PAGE 2

1    Q.   Does your job involve any calculations of          11:10:39

2    overtime rates for employees?

3    A.   Yes.

4    Q.   How so?

5    A.   Can you clarify what your definition of

6    "overtime"?  Because the payroll definition of

7    "overtime" and then the legal definition of "overtime"

8    tend to be a little bit different.  So I just want to be    11:10:59

9    sure that I understand your question.

10    Q.   Better yet, why don't you tell me what your

11    understanding of overtime is.

12    A.   Overtime is when an employee work more than --

13    more than the statutory requirements based on state or

14    Fair Labor Standard laws, being forty hours a week,

15    eight hours in a day in certain states.

16    Q.   Okay.  We can use your definition.  That's

17    fine.

18    A.   Okay.

19    MR. BECERRA:  Can you read back the question?          11:11:37

20                    (Record read.)

21    THE WITNESS:  The information is received from the

22    stores, or the hours that are received from the stores

23    are then inputted into our payroll system, and our

24    payroll system derive the remuneration to be paid to the

25    employee.

Page 51

```
 1    BY MR. BECERRA:

 2         Q.  Is it the same payroll system for employees

 3    nationwide?

 4         A.  Yes.                                    11:11:59

 5         Q.  There's no separate payroll systems for

 6    individual states, or it's one, the numbers go into one

 7    payroll system for the country?

 8         A.  Yes.

 9         Q.  Does the system have a name?

10         A.  It's Ceridian Source 550.

11         Q.  Is that a computer program of some sort?

12         A.  Yes, it is.

13         Q.  Payroll program?

14         A.  Yes, it is.

15         Q.  Do you, as part of your duties, have any    11:12:29

16    responsibility for actually calculating the overtime

17    rates of pay?

18         A.  No.

19         Q.  You input the data, the system calculates --

20    does the calculations; is that accurate?

21         A.  Correct.

22         Q.  Are you aware of any auditing system or team or  11:13:03

23    process by which Aeropostale reviews overtime

24    calculations to ensure that they're done accurately?

25         A.  No.
```

Page 52

EXHIBIT 3 PAGE 4

1    calculating the overtime rate on bonuses?

2        A.  Yes.

3        Q.  What's your responsibility?

4        A.  After the information is received, processing        11:15:59

5    it based on the California statute.

6        Q.  And so the information you get from HRIS is

7    bonus amount, correct?

8        A.  Correct.

9        Q.  And that bonus amount, does that have overtime

10   computed already, or is that something that has to be --

11   that still needs to be done?

12       A.  That's something that still needs to be done.

13       Q.  So you get a raw number without overtime?

14       A.  Correct.

15       Q.  And what do you do with that number?

16       A.  Which number?

17       Q.  The bonus.

18       A.  The bonus is inputted into the system and paid

19   to the employee.                                           11:16:29

20       Q.  Do you do -- strike that.

21           And your understanding is that Aeropostale pays

22   overtime on that bonus?

23       A.  Yes.

24       Q.  How do you ensure that the proper amount of

25   overtime is included in that bonus?

Page 55

Sarnoff, A VERITEXT COMPANY
877-955-3855

EXHIBIT 3 PAGE 5

1       A.  Can you repeat that again?  Sorry.          11:16:59

2       Q.  Sure.  How do you ensure that the proper amount

3  of overtime has been paid on a particular bonus?

4       A.  We have an Excel model that calculates the

5  bonus amount, or the bonus overtime that is due on the

6  bonus.

7       Q.  Is there an audit process or a review process

8  to ensure that, hey, this person's overtime was

9  calculated properly?

10      A.  Yes.

11      Q.  Okay.  That's something that you're responsible

12  for?

13      A.  Yes.

14      Q.  And what is that audit procedure?  Is there a

15  monthly audit, a weekly audit?  How is that done?

16      A.  It's much more on an on demand audit.  So,          11:17:29

17  being that, if it's -- if -- once it's being paid, I

18  will spot check to review it to ensure that it's

19  correct.

20      Q.  And how do you do that?  How do you ensure it's

21  correct?  What do you do?

22      A.  I just review the formulas to ensure that

23  nothing has changed.

24      Q.  Which formulas are you talking about?

25      A.  The formulas in terms of how to calculate bonus

Page 56

EXHIBIT 3 PAGE 6

1    in 2011?

2        A.   Yes.   It's much more creating an Excel model

3    that they can use versus -- the formula had already

4    existed prior to me starting with Ralph -- with

5    Aeropostale.   So it's much more or less just creating an

6    Excel model that would do the calculation.

7        Q.   What did they use before that?          11:19:32

8        A.   It was Excel.

9        Q.   So with respect to the Ceridian program, is the

10   overtime on bonuses calculated by Ceridian?

11       A.   No, it's not.

12       Q.   It's done through this Excel model we've been

13   discussing?

14       A.   Yes.

15       Q.   And that's been the same since you've been

16   there in 2011?

17       A.   It's been the same since -- it's been refined

18   since I got -- since I started with Aeropostale.

19       Q.   In April of 2010?                        11:19:59

20       A.   Yes.

21       Q.   And is that Excel model utilized for all

22   employees who receive bonuses?

23       A.   Yes.

24       Q.   And that's employees nationwide, or is it state

25   by state?

                                              Page 58

EXHIBIT 3 PAGE 7

1       A.   Nationwide.

2       Q.   And at least since April 2011 when your            11:20:22

3   employment started, that's been the practice?

4       A.   Since I've been there since April 2010, the

5   formula has been revised to as recently as 2011.

6   Just -- and it's not a formula, it's just more of the

7   Excel model, to ensure that the model is encompassing

8   all of the right attributes.

9       Q.   Do you know what process Aeropostale utilized

10  prior to your employment starting?

11      A.   Process in terms of --

12      Q.   Sorry.  For calculating the overtime on           11:21:00

13  bonuses.

14      A.   Yes.

15      Q.   What did they use before?

16      A.   They used an Excel model, as well.

17      Q.   And that Excel model that they utilized before,

18  that was a model that, again, was applicable to all

19  employees who received these bonuses?

20      A.   Yes.

21      Q.   And that's nationwide?

22      A.   Yes.

23      MR. BECERRA:  Let's mark as the next exhibit,

24  Exhibit Number 3, a package of documents that has been

25  produced by Aeropostale that's Bates labeled 2879

                                                      Page 59

1       A.   No.

2       Q.   The information you receive from HRIS regarding

3  bonuses, does it designate whether the employee is an

4  exempt employee or a nonexempt employee?

5       A.   No.

6       Q.   What is the information that's provided to you       11:29:58

7  by the HRIS regarding bonuses?

8       MS. GLOUSMAN:   Vague and ambiguous.

9       MR. BECERRA:   For payroll purposes.

10       THE WITNESS:   Can you -- can you be more specific

11  in terms of --

12       MR. BECERRA:   Sure.

13       Q.   Again, my understanding is, you in the payroll

14  department, you get information from HRIS regarding a

15  bonus to an employee.   As an example, you get, John Doe

16  is going to get a $500.00 bonus, correct?

17       A.   Yes.

18       Q.   Does it -- How does that information come to

19  you?   Does it come to you in a spreadsheet?   Does it       11:30:25

20  come through electronically in some way?   How is it you

21  receive that?

22       A.   It can be a various -- various medium, being

23  electronic or hard paper.

24       Q.   And that process, getting the information from

25  HRIS, is a nationwide process.   You get information

Page 65

EXHIBIT 3 PAGE 9

1  regarding employees that work all over the country?

2      A.  Correct.

3      Q.  And the information that you get from HRIS,

4  whether it's the electronic medium or the hard copy you      11:30:56

5  just discussed, what does it tell you about the employee

6  who's receiving that bonus, if anything?

7      A.  Other than their name and the employee number

8  and the amount, nothing.

9      Q.  Okay.  So when you get that information, how do

10  you determine which employees you're going to calculate

11  an overtime bonus calculation for?  Or do you do it for

12  everyone that you get bonus information --

13      A.  Do it for everybody who's in -- who receive a      11:31:30

14  bonus.

15      Q.  Do you use the same spreadsheet model for all

16  the bonus, bonus information you receive regarding each

17  of the employees?

18      A.  Yes.

19      Q.  In other words, you don't have one spreadsheet

20  for Managers, one for Assistant Managers, one for      11:32:00

21  General Managers, one for different types of

22  employees?

23      A.  No.

24      Q.  Same spreadsheet for each, for all the

25  employees?

Page 66

EXHIBIT 3 PAGE 10

1        A.  Yes.

2        Q.  Other than the types of employees identified

3   here, are you aware of any other types of employees that        11:32:28

4   work in the stores?

5        MS. GLOUSMAN:  Talking about California stores?

6        MR. BECERRA:  We'll start any stores.

7        THE WITNESS:  Yes.

8   BY MR. BECERRA:

9        Q.  What other types of employees work in the

10  stores?

11       A.  Stock Associate, which is the same as a Sales

12  Associate.

13       Q.  Anyone else?  Any other type of employee?

14       A.  Work in the store, no.                               11:33:01

15       Q.  Are there -- strike that.

16          Do you know if there are Stock Associates

17  employed in California stores?

18       A.  I can't answer that question specifically.

19       Q.  Do you know if the spreadsheet process, in

20  terms of the calculation of bonuses, has been in place        11:33:29

21  since 2007?  Do you know the answer to that?

22       A.  Can you repeat the question for me?

23       Q.  Sure.  We've been talking about, you know, you

24  receive the information from HRIS, you use this

25  spreadsheet Excel model we've been talking about for all

                                                        Page 67

EXHIBIT 3 PAGE 11

1      Q.  You were at Polo Ralph Lauren.

2      A.  I -- yes, 2007.

3      Q.  So we've been talking about this Excel model.

4   You get the bonus information from HRIS, you use this

5   model, this Excel spreadsheet model to calculate the

6   overtime for all the employees that receive bonuses,

7   correct?

8      A.  Yes.

9      Q.  Do you know if that was the same process

10  utilized in 2007?

11     A.  Yes.

12     Q.  It was?

13     A.  Yes.

14     Q.  Okay.  In your role as the Director of Payroll,   11:37:00

15  do you do any training as to the payroll processes for

16  Managers that work in the stores?

17     A.  Can you repeat that again?

18     Q.  Sure.  In your role as the Director of Payroll,

19  do you do any trainings for actual Store Managers as to

20  how to conduct payroll, how to do payroll properly, how

21  to calculate hours worked or overtime or anything like

22  that?

23     A.  No.

24     Q.  And just, I'm looking at page 2892 of Exhibit    11:38:30

25  Number 3.  And focusing on the area that says "Topic:

                                                    Page 71

EXHIBIT 3 PAGE 12

```
 1        THE WITNESS:  I have two pages of the same thing,

 2   labeled the same thing.

 3        MR. BECERRA:  Do you have 1735 on yours?

 4        THE WITNESS:  I have 1735 and 1735.

 5        MR. BECERRA:  Okay.  That's what I'm looking at.

 6   Let's look at Bates label 1735.

 7        THE WITNESS:  Okay.

 8   BY MR. BECERRA:

 9        Q.  And there's a bunch numbers on that page,        12:10:26

10   different bonus calculations.  Do you see those?

11        A.  Yes.

12        Q.  With respect to your department's process of

13   calculating the overtime on these bonuses, do you do any

14   calculations with respect to actually coming up with the

15   bonus amount, or is that done somewhere else?

16        A.  That is not done by my department.

17        Q.  Do you know where that's done?

18        A.  By the HRIS HR team.                            12:10:58

19        Q.  And I think you've answered this, but I just

20   want to be clear, that the model that you utilize, the

21   Excel model for the calculation of overtime, it's the

22   same model regardless of what state the employee works

23   in, correct?

24        A.  That is correct.

25        MS. GLOUSMAN:  Just so I have clarification, you're
```

Page 87

EXHIBIT 3 PAGE 13

1  talking about the Excel model for the calculation of

2  overtime on the bonuses?

3       MR. BECERRA:  Yes.

4       Q.  The answer's still the same, right?

5       A.  It's still the same, yes.

6       MR. BECERRA:  Let's look at the next document.

7  This is Exhibit Number 5.

8            (Deposition Exhibit 5 marked.)

9       MR. BECERRA:  Take a moment to look at Exhibit

10 Number 5.

11      THE WITNESS:  Okay.                          12:12:37

12      MR. BECERRA:  First of all, before we start, do you

13 have all the pages?  This is a document Bates labeled

14 1738 through 1742.

15      THE WITNESS:  Yes.

16 BY MR. BECERRA:

17      Q.  Have you seen Exhibit Number 5 before?      12:13:28

18      A.  Yes.

19      Q.  When's the first time you saw Exhibit Number 5?

20      A.  In preparation for this case.

21      Q.  And what is Exhibit Number 5?

22      A.  It's a 2008 Monthly Sales Bonus Plan.

23      Q.  And do you know who this applied to, what type

24 of employees this applied to?

25      A.  Store Managers, General Managers, Assistant    12:13:59

                                               Page 88

1    Q.   They do?

2    A.   Yes.

3    Q.   What about Assistant Managers, do you know if

4    they receive shrink bonuses?

5    A.   Yes.

6    Q.   Yes, they receive them?

7    A.   Yes, they receive it.

8    Q.   Do you know if there's any other policy --

9    strike that.

10         Do you know if there was any other policy back

11   in 2008 that referenced Assistant Managers and one for     12:19:58

12   Managers; if there was any other document that described

13   the shrink bonus plan for those other types of

14   employees?

15   A.   Not that I can recollect.

16   Q.   You've never seen one that's --

17   A.   I've never seen one, correct.

18   Q.   When you receive the information from HRIS       12:20:28

19   regarding bonuses, does it tell you the type of bonus

20   that is being paid to the employee?

21         In other words, when you get the information,

22   whether it's hard copy or electronic, does it say, this

23   is a shrink bonus, this is a sales bonus, this is a

24   referral bonus?  Does it indicate the type of bonus?

25   A.   Yes.

Page 92

EXHIBIT 3 PAGE 15

1      Q.  Does that change how you go about calculating

2  the overtime?

3      A.  No.

4      Q.  And is it your understanding that that, what      12:21:03

5  you just described, in terms of it not affecting the

6  overtime calculation regardless of the bonus, that

7  that's the been the same since 2007?

8      A.  As far as I know, yes.

9      Q.  What is a shrink bonus?  Do you know what a

10  shrink bonus is, what that refers to?            12:21:29

11      A.  Yes.

12      Q.  What does that mean, shrink bonus?

13      A.  It's in relation to inventory management.

14      MR. BECERRA:  Let's look at the next exhibit,

15  Exhibit Number 7.

16          (Deposition Exhibit 7 marked.)

17      MS. GLOUSMAN:  What time are you thinking of us

18  breaking for lunch?

19      MR. BECERRA:  Do you guys want to break now?      12:22:27

20      MS. GLOUSMAN:  Are you tired?  I'm fine, but --

21      THE WITNESS:  I can go -- after this document we

22  can break for lunch.

23      MR. BECERRA:  Sure.  Sounds fine.

24      THE WITNESS:  Because I'm still on east coast

25  time.

Page 93

1  to receive a shrink bonus in 2009?

2      A.  Yes.

3      Q.  Do you know if any Assistant or Associate

4  Manager actually received a shrink bonus in 2009?

5      A.  I can't answer that question directly.          12:26:58

6      Q.  Are there documents that you're aware of that

7  would indicate whether or not an Assistant or Associate

8  received a shrink bonus in 2009?

9      A.  Not that I'm aware of.

10      Q.  HRIS reports wouldn't indicate that?

11      A.  I wouldn't be able to answer that question

12  directly.  Sorry.  I don't know.

13      Q.  Is there any document you could go back to your

14  office and look at, research, pull up from the system

15  that would say one way or another whether or not an

16  Assistant or Associate received a shrink bonus in          12:27:29

17  2009?

18      A.  Yes.

19      Q.  And what document would you look at?

20      A.  It would be the bonus file that payroll

21  received.

22      Q.  That's the same bonus file you talked about

23  before?

24      A.  Yes, that we would receive from HRIS.

25      Q.  What's in the bonus file?

Page 97

EXHIBIT 3 PAGE 17

1      A.   It's the employee name, their number, the bonus

2   amount, and the type of bonus we paid.

3      Q.   And that is kept for each employee?

4      A.   It's the entire country in one.

5      Q.   Is it broken out by pay period, by person, by

6   location, by state?  Can you just pull up -- can you          12:28:00

7   just put someone's name in and get all the bonuses that

8   were paid to that particular person?

9      A.   No.

10      Q.   How would you search that?

11      A.   We would have to run a report off of the

12   payroll system.

13      Q.   But that report would indicate all the bonuses

14   that were paid nationwide?

15      A.   Yes.

16      Q.   And it would tell you the date that they were        12:28:29

17   paid?

18      A.   It would tell you the date of the paycheck.  It

19   would tell us the paycheck date.

20      Q.   Got it.  Have you ever seen any document that's

21   entitled "Shrink Bonus Criteria for 2009" applicable to

22   Managers?

23           This one discusses District Managers, I think

24   you said this is -- or sorry -- this was applicable to

25   store executives?

Page 98

EXHIBIT 3 PAGE 18

1      MR. BECERRA:  Sure.

2               (Record read.)

3      THE WITNESS:  I did not look at it from a state

4  perspective.  As I indicated earlier, when I discovered

5  the issue, I looked at the issue much more from, from a

6  wholistic point of view, to ensure that we were          13:49:58

7  calculating the bonus OT correctly.

8  BY MR. BECERRA:

9      Q.  Well, the change that you made to the

10  spreadsheet, did that change affect employees across the

11  country?

12          In other words, you came up with a new formula,

13  right, to properly account for the double time hours

14  now?

15      A.  Correct.

16      Q.  And did that calculation and that spreadsheet

17  and that formula apply to all employees nationwide?       13:50:25

18      A.  The formula was applied to all employees

19  nationwide, because it affects all employees' report of

20  the Excel model.

21      Q.  Right.  Because you used one Excel model for

22  all the employees?

23      A.  Correct.  However, only in the State of

24  California I think there is -- actually, I would be

25  speculating, because I don't remember the exact laws

                                                      Page 119

EXHIBIT 3 PAGE 19

```
 1    consisted of the number of hours that we had to move

 2    from regular, regular hours, or classified as regular

 3    hours that should be overtime hours.              14:04:56

 4         And I am going to say this.  In order to -- so

 5    that it doesn't sound as though it was all a manual

 6    process, the system had some basic intelligence to say

 7    anything over forty hours go into overtime.  What it did

 8    not have was the intelligence to say, eight hours, five

 9    minutes in one day in California would represent eight

10    hours of regular, five, five minutes of overtime.  It

11    did not have that level of intelligence.

12         Q.  Got it.  Because California was different than  14:05:29

13    the normal FLSA rules?

14         A.  It was different from any auto overtime rule in

15    the states, in the U.S.

16         Q.  Got it.  So then the District Manager would

17    then submit a report to you in payroll, saying move 5.57

18    hours from regular earnings to overtime earnings?

19         A.  Correct.

20         Q.  And they would submit some sort of spreadsheet

21    to you, some spreadsheet to you for all the employees in

22    that particular district?

23         A.  Yes.  All the, all the employees that were    14:05:57

24    eligible for any type of --

25         Q.  Overtime.
```

Page 128

1       A.   -- overtime in that period.

2       Q.   And then do you know how the earnings, the next

column over, the earnings were calculated, the 196.83?

4       A.   That's a year to date total.  Actually was her

5  first paycheck.  So it would be her rate of pay times

6  one and a half, meaning that it's overtime, times the

7  number of hours that was inputted.

8       Q.   So, again, the same regular rate computation        14:06:29

9  that you used for regular hours as the base regular

10  rate, you would multiply that by time and a half --

11       A.   Yes.

12       Q.   -- to get the new rate for overtime?

13       A.   Yes.

14       Q.   And then multiply that by however many overtime

15  hours?

16       A.   Correct.

17       Q.   Turning to the next pay stub, 1865, there's a        14:06:59

18  new category on this one under "Hours and Earnings," and

19  that's entitled "DM DBL ADJ."  Do you see that?

20       A.   Yes.

21       Q.   What does that mean?

22       A.   DM, double -- it's District Manager double time

23  adjustment.

24       Q.   And would the same thing apply, the way you

25  just described it for OT, apply for double time, as        14:07:27

Page 129

EXHIBIT 3 PAGE 21

1      A.   Yes.

2      Q.   Can you tell from these documents what portion

3   of the 872.54 paid as a bonus to Ms. Sankey was

4   overtime?

5      A.   Was overtime, and based on what definition of

6   "overtime"?

7      Q.   Your definition.

8      A.   Of overtime over forty hours?

9      Q.   Any overtime.  I want to know what part of that

10  872.54 was a bonus, and what part was overtime.

11     A.   The 872 was a true representation of her          14:17:31

12  bonus.

13     Q.   Can you tell from looking at these documents

14  what portion of that was payment for overtime hours?

15     A.   Of the 872.54, none of it represented bonus

16  OT.

17     Q.   So that was the, that was the calculation of

18  bonus under the bonus policy?

19     A.   Yes.

20     Q.   And, okay.  And so that 872.54 doesn't have any

21  built-in overtime paid to her?                          14:17:59

22     A.   Does not include any bonus OT paid to her,

23  correct.

24     Q.   Do you know why?

25     A.   No.

                                              Page 137

EXHIBIT 3 PAGE 22

1      Q.   Do you know if she worked any -- well, strike

2    that.

3           Do you have any understanding as to, this was

4    paid in September of 2007.  Would this have been based

5    off of her performance or the store's performance in the

6    prior month?

7      A.   Yes.

8      Q.   And do you know whether or not in the prior        14:18:30

9    month, August of 2007, whether or not she worked any

10   overtime?

11     A.   Based on her paycheck, based on her paycheck as

12   presented in Exhibit 12, it indicated that she had

13   overtime payments to her in the month of August.

14     Q.   And as you sit here, you don't know why there      14:18:58

15   would have been no additional overtime amount paid to

16   her in this first 872.54 bonus?

17     A.   In terms of the bonus overtime, no.

18     Q.   But you can tell from looking at this that

19   there was no overtime component to that bonus?

20     A.   That is correct.

21     Q.   Looking at the first page of this, the screen

22   print of Exhibit 13 for a minute, do you know what

23   "clock number" means?                                    14:19:29

24     A.   Clock numbers are employee number.

25     Q.   Each employee has their own number?

Page 138

```
1        A.   Correct.  No, Store Manager.

2        Q.   Store Manager, sorry.  And the next column over

3   on the spreadsheet is "Percent Above."  What does that        14:20:29

4   mean?  If you know.

5        A.   I don't know.

6        Q.   The next column says "Volume," and then it has

7   an "HV."  Do you know what that means?

8        A.   I don't, either.

9        Q.   And then the "Regular Hours" number has a 200

10  there.  Do you know where that came from?

11       A.   It was from her paychecks that were paid in the    14:20:57

12  bonus period.

13       Q.   That would be the prior month?

14       A.   The number of hours worked in that bonus

15  period.

16       Q.   Okay.  And the bonus period would have been in

17  the prior month?

18       A.   Generally it is paid a month lag, yes.

19       Q.   Okay.  And then the next column says "Regular

20  Earnings," and it has "680."  Do you know how that 680

21  was calculated?

22            I can tell you, if you'd look at the second

23  page of Exhibit 13, there is a calculation for that

24  field, which is, essentially it looks like it's regular

25  hours, the "Regular Hours" column multiplied by 3.4.  So
```

Page 140

EXHIBIT 3 PAGE 24

```
 1    didn't clock out, you have a 28 hour, or 24 hour period
 2    where you didn't clock out, we've got to adjust that,
 3    that would be adjusted to regular hours, that sort of
 4    thing?
 5         A.  Well, it would be adjusted based on the --
 6    based on the number of hours worked on that particular
 7    day, or true up to the particular week.              14:23:28
 8         Q.  The next column is "OT Hours."  And would that
 9    be the OT hours in the bonus period, so typically the
10    prior month?
11         A.  OT hours would have represented total amount of
12    overtime hours that she worked in the bonus period.
13         Q.  Right.  So in the bonus period, it typically is
14    the prior month?
15         A.  It's the prior month, yes.
16         Q.  And I'll represent to you that that, I think
17    that's accurate, because I went back and added up her OT   14:23:58
18    hours for the prior month, and that's what they totaled,
19    so that makes sense.
20              And then "OT Earnings," it says 180.64.  And
21    again, I don't -- do you know how that was calculated?
22         A.  No, I don't.
23         Q.  And again, I'll represent to you that on the   14:24:29
24    second page of Exhibit 13, the formula, if you would
25    click on that in the spreadsheet, which actually, it is
```

                                                        Page 142

EXHIBIT 3 PAGE 25

1    Q.  Same spreadsheet analysis.

2    MR. BECERRA:  Let's mark as Exhibit 14 the next        14:40:23

3    exhibit.

4         (Deposition Exhibit 14 marked.)

5    MR. BECERRA:  Exhibit 14 is essentially the same as

6    Exhibit 13, but for the next bonus period, which is,

7    again, this is the 10/20/2007 bonus period.

8    Q.  Does the first page of Exhibit 14 look familiar      14:41:00

9    to you?

10   A.  Yes.

11   Q.  As the Excel format that calculates something

12   related to bonuses?

13   A.  Correct.

14   Q.  Is this utilized to calculate the overtime on

15   bonuses, too?

16   A.  There was no bonus OT calculation.

17   Q.  So, you can tell from looking at Exhibit 14,

18   the first page here, that that 996.22 paid to Ms. Sankey

19   on October 26, 2007 did not have any -- no portion of      14:41:26

20   that was overtime pay?

21   A.  No portion of it was bonus OT pay.

22   Q.  Bonus OT pay?

23   A.  Yes.

24   Q.  Do you know if she worked overtime in the bonus

25   period that relates to this particular bonus of 996.22?

Page 148

EXHIBIT 3 PAGE 26

1    A.  Based on her check history that was presented    14:41:49

2    in, I think it was Exhibit 12, yes, she did work

3    overtime during the period.

4        Q.  Do you know why there would be no additional

5    overtime included in this bonus?

6        A.  Can you repeat that again?  Sorry.

7        Q.  Yeah.  Do you know why there would be no OT

8    calculated in this bonus?

9        A.  No bonus overtime?

10       Q.  Right.

11       A.  No.

12       MS. GLOUSMAN:  I don't know if you want to

13   short-circuit things, but if you're planning on going    14:42:30

14   through each of the months, he testified earlier that

15   the OT on bonuses was added in 2009 for the Store

16   Managers previously.  I think that if the point is to go

17   through each month, we can short-circuit that, if that's

18   what the intention is.

19       MR. BECERRA:  Can we go off the record for a

20   second?

21       THE VIDEOGRAPHER:  Off video at 2:42 p.m.

22            (Discussion off the record.)

23       THE VIDEOGRAPHER:  Back on video at 2:44 p.m.

24       MR. BECERRA:  Back on the record.

25            I had a discussion with counsel with respect to

Page 149

```
 1    some of the seminal facts in the case.  I'm just going      14:44:59

 2    to try to circumvent the process.

 3         Q.  Prior to August -- strike that.

 4              Prior to the pay period, the pay period

 5    November 2009, is it your testimony that Aeropostale did

 6    not calculate the overtime on bonuses paid to Sales

 7    Managers?

 8         MS. GLOUSMAN:  Store Managers?

 9         THE WITNESS:  To Store Managers?

10         MR. BECERRA:  To Store Managers.

11         MS. GLOUSMAN:  In California?

12         THE WITNESS:  Yes.  To Store Managers in

13    California, the first paycheck that employees received a   14:45:25

14    bonus OT was in November 2009, and it was based on

15    August hours and earnings of that same year.

16    BY MR. BECERRA:

17         Q.  So prior to that, for California Store

18    Managers, there was no additional overtime calculated on

19    bonuses that were paid to them?

20         A.  That would be correct.

21         Q.  And is that true for Assistant Managers during

22    that time frame?

23         A.  No.

24         Q.  What was the difference?

25         A.  The difference was that the Assistant Managers
```

Page 150

```
 1    divulge attorney/client communications?

 2         A.  That is correct.

 3         Q.  And again, looking at Exhibit 14, the 4.98

 4    "Percent to Plan," do you know what that means?

 5         A.  No, I don't.

 6         Q.  Let's move on to document 1875 in Exhibit 12.    14:53:40

 7    This will go quicker.  Do you see where it says "Sales

 8    Bonus"?

 9         A.  Yes, I do.

10         Q.  And you see where it says $741.02?

11         A.  Yes, I do.                                       14:53:58

12         Q.  That amount did not include any overtime,

13    correct?

14         A.  That is correct.  Did not include any bonus

15    overtime.

16         Q.  Bonus overtime, correct.  She received a bonus,

17    didn't receive overtime on that bonus?

18         A.  That is correct.

19         Q.  Let's move on to 1884.  This is a check date

20    March 14, 2008.  You see a sales bonus for Ms. Sankey of   14:54:25

21    $629.28?

22         A.  Yes, I do.

23         Q.  That amount did not include any overtime, did

24    it?

25         A.  Did not include any bonus overtime.
```

Page 157

1        Q.   Well, that's a bonus, correct?

2        A.   Yes.

3        Q.   That bonus amount did not include any

4    overtime?

5        A.   That is correct.

6        Q.   Let's move forward in time to document 1888.        14:54:58

7    This is a pay stub or pay report for the pay period or

8    check date April 25, 2008.  Sales bonus paid to Ms.

9    Sankey of $499.75.  Do you see that?

10       A.   Yes, I do.

11       Q.   That amount, that sales bonus did not include

12   any overtime, correct?                                       14:55:29

13       A.   Correct.

14       Q.   Let's move forward to 1891.  All of this is in

15   Exhibit 12.  This is a check date of May 23, 2008.  Ms.      14:55:53

16   Sankey received, on that date, a bonus of $1,080.28.  Do

17   you see that?

18       A.   Yes.

19       Q.   That amount did not include any overtime; is

20   that correct?

21       A.   That would be correct.

22       Q.   Let's move forward to 1898.  This is for the        14:56:24

23   pay period, a check date of June 20, 2008.  Ms. Sankey

24   received a sales bonus of $739.03.  Do you see that?

25       A.   Yes, I do.

Page 158

1     Q.   That amount did not include any overtime; is

2   that accurate?

3     A.   That is correct.

4     Q.   We'll move forward to 1903, check date of          14:56:58

5   August 15, 2008.  Ms. Sankey received a sales bonus on

6   that date of $1,125.63.  Do you see that?

7     A.   Yes.

8     Q.   That amount did not include any overtime,

9   correct?

10    A.   That is correct.

11    Q.   Let's move forward to 1906.  This is a check        14:57:31

12   date of September 12, 2008.  Do you see that?

13    A.   Yes.

14    Q.   Ms. Sankey received a sales bonus of $800.00.

15   Do you see that?

16    A.   Yes.

17    Q.   Did that amount include overtime?

18    A.   No.

19   MR. BECERRA:  Before we move on to the next pay          14:58:30

20   stub, let's mark this as Exhibit Number 15.

21          (Deposition Exhibit 15 marked.)

22   MR. BECERRA:  Take a moment to look at Exhibit

23   Number 15.  The first one, again, this is -- these are   14:59:00

24   documents that were derived from a CD provided by

25   Aeropostale.  The first is a screen print of one of

Page 159

EXHIBIT 3 PAGE 31

1    those Excel spreadsheets; the second one is a printout

2    of it with our annotations with respect to the formulas

3    that were embedded in the spreadsheet.

4           And I point this one out to your attention

5    because it -- beginning on this particular date,          14:59:29

6    September of 2008, the format appeared to change on the

7    calculation of bonuses and that sort of thing.  And so I

8    just want to understand what happened or what the change

9    was.

10         Q.  So, first taking a look at the first page of

11   this screen print, does this look familiar to you at

12   all?

13         MS. GLOUSMAN:  Again, I object to the extent that

14   questions about the way that the bonus itself was

15   calculated is beyond the scope of Mr. Boatswain's        14:59:58

16   designation.

17   BY MR. BECERRA:

18         Q.  Have you ever seen this spreadsheet before?

19         A.  Yes.

20         Q.  What is this spreadsheet?  What's it used

21   for?

22         A.  This appears to be the bonus calculation -- the

23   bonus calculation.                                       15:00:28

24         Q.  And we've already discussed and established and

25   beaten the dead horse that prior to the November of 2009

Page 160

EXHIBIT 3 PAGE 32

1   pay period, there wasn't OT paid on the bonuses for

2   Sales Managers, correct?

3       A.  For Store Managers.

4       Q.  Right, for Store Managers.

5       MS. GLOUSMAN:  In California.

6   BY MR. BECERRA:

7       Q.  This wasn't a document that was used for the

8   calculation of bonuses then for Store Managers, OT on

9   their bonuses; is that accurate?

10      A.  Looking at this spreadsheet, I don't see it as    15:01:07

11  being part of, no.

12      Q.  Okay.  Let's move forward in Exhibit 12 to        15:01:30

13  1910.  This is a check report for a check date October

14  24, 2008.  You see that Ms. Sankey received a sales     15:01:56

15  bonus of $1,400.00?

16      A.  Yes.

17      Q.  That sales bonus did not include any overtime;

18  is that accurate?

19      A.  It did not include any bonus overtime, yes.

20      Q.  Do you know -- strike that.

21          Do you know if there was a change in the way

22  that Aeropostale calculated bonuses for Store Managers  15:02:25

23  beginning in September of '08?

24      MS. GLOUSMAN:  Object to the extent that it's

25  beyond his designation.

Page 161

EXHIBIT 3 PAGE 33

```
 1      well.  I mean, I know you're not designated as the PMK

 2      regarding how the calculation of bonuses was, but if you

 3      know, that's all I'm asking.  If you don't know, you

 4      don't know.  That's fine.

 5            Moving forward to 1913 in Exhibit 12, this is

 6      for a pay period ending, or a paycheck date of November

 7      21, 2008.  You see Ms. Sankey received a sales bonus of

 8      $600.00, correct?                                   15:04:29

 9          A.  Yes.

10          Q.  That amount did not include any additional

11      bonus OT?

12          A.  That is correct.

13          Q.  Moving forward to 1918, check date of January   15:04:57

14      16, 2009, you see Ms. Sankey received a bonus of

15      $1,900.00, correct?

16          A.  That is correct.

17          Q.  That amount did not include payment of any

18      overtime on that bonus from Aeropostale, correct?

19          A.  That is correct.

20          Q.  Moving forward to 1921, check date of February

21      13, 2009, Ms. Sankey received a sales bonus of $650.00,   15:05:30

22      correct?

23          A.  That is correct.

24          Q.  Aeropostale did not pay her overtime on that

25      sales bonus?
```

Page 163

EXHIBIT 3 PAGE 34

1      A.  That is correct.

2      Q.  Moving forward to 1924, check date of March 13,

3  2009, Ms. Sankey received a sales bonus of $650.00,

4  correct?

5      A.  That is correct.                              15:05:59

6      Q.  Aeropostale did not pay her overtime on that

7  bonus, correct?

8      A.  That is correct.

9          Can I have a moment to clarify something with

10  you?

11     MS. GLOUSMAN:  You want to take a break?

12     THE WITNESS:  Yes.

13     MR. BECERRA:  Sure.

14     THE VIDEOGRAPHER:  Off video at 3:07 p.m.

15                  (Recess.)

16     THE VIDEOGRAPHER:  Back on video at 3:11 p.m.     15:10:58

17  BY MR. BECERRA:

18     Q.  We're back on the record, Mr. Boatswain.  You

19  understand you're still giving testimony under the

20  penalty of perjury, correct?

21     A.  Yes, I do.

22     MR. BECERRA:  Let's mark the next exhibit, 16.    15:11:17

23          (Deposition Exhibit 16 marked.)

24     MR. BECERRA:  And believe me, I'm not going to ask

25  you to read through this whole thing.  Just, I want

                                              Page 164

EXHIBIT 3 PAGE 35

1   the two different types.

2       Q.  So, that, and that formula you just

3   articulated, I can -- if I had your spreadsheet          15:49:27

4   regarding the calculation, I'd be able to pull that up

5   and highlight a particular cell, and it would show me

6   that --

7       A.  Yes.

8       Q.  -- that formula?

9       A.  Yes.

10      Q.  And would that be on the same sort of

11  spreadsheet Excel model we've been looking at prior to

12  '09?

13      A.  It will be in the similar type, yes, for

14  those.

15      Q.  And that formula and the way you computed that

16  in this Excel model, that would have been the same for

17  all employees in California?

18      A.  Correct.

19      Q.  Who received a bonus.

20      A.  That is correct.  Who receive a bonus and      15:50:00

21  worked overtime, because both had to be true.

22      Q.  And if that was true, you'd use the same

23  formulation with respect to calculating the OT?

24      A.  Yes.

25      MR. BECERRA:  And again, you know, we don't have

Page 178

EXHIBIT 3 PAGE 36

1    Q.   Wasn't the sales bonus a production related

2  bonus?

3    A.   It was a production related bonus as well, yes.

4    Q.   Do you know why Aeropostale was paying overtime

5  to Store Managers prior to '09 on shrink bonuses but not

6  sales bonuses?

7    A.   The Store Managers?

8    Q.   Yes.

9    A.   Prior to 2009, it was, based on my discovery      16:06:29

10  for this case, I discovered that no bonus type, and I do

11  want to make sure that I -- because there's so many

12  different types of bonuses, let me just make sure that I

13  clarify myself correctly.

14      Prior to 2009, no bonus type was included for

15  Store Managers --

16    Q.   In the bonus OT calculation.

17    A.   In the bonus OT calculation, correct.

18    Q.   Great.  That's all I was trying to understand.

19      And after 2009, they started paying overtime on      16:06:59

20  the sales bonuses to Store Managers?

21    A.   Correct.

22    Q.   Did they also start paying OT on the shrink

23  bonus or any -- on all the other types of bonuses that

24  Store Managers received?

25    A.   On the -- of all of the other types of bonuses

Page 190

EXHIBIT 3 PAGE 37

1    that were eligible for bonus OT.

2        Q.  So for all those other bonuses, they also

3    started paying OT after November of '09?

4        A.  Correct.

5        Q.  And with respect to the codes, we talked about    16:07:30

6    the adjustment to overtime line item, does it

7    differentiate between the type of bonus that was

8    received?  In other words, if you get a sales bonus,

9    there's going to be a line item for -- and you worked

10   overtime, there's going to be a line item for the OT

11   adjust?

12       A.  It was the same earnings code.

13       Q.  Okay.  So regardless of the bonus type, it's

14   going to be in the same line item for the adjustment to

15   the overtime?                                          16:08:00

16       A.  Correct.

17       Q.  Was there ever any documentation that you're

18   aware of that was provided to employees that described

19   what these codes meant?

20       A.  I'm not aware of any.

21       Q.  And with respect to the adjustment number,      16:08:29

22   because I've never seen a pay stub that has that on

23   there, is there a corresponding rate of pay that's shown

24   on that adjustment, or is there just a dollar number?

25       A.  It is just a dollar amount.

Page 191

1      A.   Correct.

2      Q.   You've seen shrink bonuses?

3      A.   Correct.

4      Q.   You've seen referral bonuses?

5      A.   Personally and directly, I can't answer that

6   question because of the fact I don't look at the

7   document to see who is being paid what based on what

8   designation.

9      Q.   Have you heard of or know of or seen, as the

10  head of payroll, any other types of bonuses paid to

11  employees?

12     A.   Paid to employees in general, yes.

13     Q.   What other types of bonuses?

14     A.   You have the referral bonus or you have -- I

15  think all the bonus types are actually listed here that        16:12:59

16  an employee may or may not be eligible for across the

17  company.

18          So you have like a bonus pay, your sales bonus,

19  your contest special bonus, shrink bonus, sign-on bonus.

20  Those are the common bonus types that are paid

21  throughout my department, or come through my department.

22  Whether or not an employee in California would have been

23  eligible for it, I can't answer that question                  16:13:28

24  specifically.

25     Q.   Did you say trick bonus?

Page 194

EXHIBIT 3 PAGE 39

1    looked at a Store Manager differently than I did look at

2    an Assistant Manager.

3        Q.  So the problem you uncovered was just, you just

4    looked at it globally, that this was a problem with the

5    calculation in general?

6        A.  I looked at it, I looked -- specific to

7    California, I looked at the situation based on the

8    employees that were paid or worked in California, I        16:31:28

9    should say.

10       Q.  These were -- yeah, okay.  So these were

11   employees who were working in California who received a

12   bonus and had worked overtime?

13       A.  Correct.

14       Q.  Or double time, I should say.

15       A.  Well, any overtime type, yes.  Bonus overtime

16   or double time, correct.

17       Q.  And we covered this.  You don't know how far

18   back that problem precipitated?  You don't know when

19   that first started?

20       A.  No, I don't.

21       Q.  After uncovering that double time issue for the   16:32:14

22   employees, did you create any new pay code to reflect

23   double time payment, or anything along those lines?

24       A.  It wasn't necessary because of the fact double

25   time adjustment or double time adjustment was already a    16:32:30

                                                          Page 200

EXHIBIT 3 PAGE 40

1        I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby certify:

3        That the foregoing proceedings were taken

4   before me at the time and place herein set forth; that

5   any witnesses in the foregoing proceedings, prior to

6   testifying, were placed under oath; that a verbatim

7   record of the proceedings was made by me using machine

8   shorthand which was thereafter transcribed under my

9   direction; further, that the foregoing is an accurate

10  transcription thereof.

11       I further certify that I am neither

12  financially interested in the action nor a relative or

13  employee of any attorney of any of the parties.

14       IN WITNESS WHEREOF, I have this date subscribed

15  my name.

16

17  Dated: 1-16-12

18

19

20

         GINA CANGIAMILA
21       CSR No. 10256

22

23

24

25

                                          Page 204

# EXHIBIT 4

1              SUPERIOR COURT OF THE STATE OF CALIFORNIA
2                      COUNTY OF LOS ANGELES
3
4
5    LA TINA SANKEY, on behalf of herself and
6    all others similarly situated,
7              Plaintiffs,
8
9       vs.                    Case No. BC457468
10
11   AEROPOSTALE WEST, INC., a Delaware
12   corporation, AEROPOSTALE, INC., a Delaware
13   corporation, and DOES 1 through 10,
14   inclusive,
15              Defendants.
16   _____
17                    May 7, 2012
18                    9:56 a.m.
19
20        Deposition of RAWLE BOATSWAIN,
     taken by Plaintiffs, pursuant to Notice,
     held at the offices of Katten Muchin
21   Rosenman L.L.P., 575 Madison Avenue, New
     York, New York, before Jineen Pavesi, a
22   Registered Professional Reporter,
     Registered Merit Reporter, Certified
23   Realtime Reporter and Notary Public of the
     State of New York.
24
     Job No. CA144029
25   PAGES 1 - 94

                                        Page 1

EXHIBIT 4 PAGE 1

1   through 9?

2        A.        Yes.

3        Q.        And you did not bring any

4   documents with you to today's deposition,

5   is that right?

6        A.        No, I did not.

7        Q.        Looking at Category No. 4, the

8   documents to be produced, it says "All

9   documents utilized to calculate the

10  under-calculated overtime as referenced in

11  Exhibit 1."

12            Do you see that?

13       A.        Yes.

14       Q.        What documents did you utilize

15  to calculate the under-calculated

16  overtime?

17       A.        Our Ceridian HR payroll system.

18       Q.        Do those documents that you

19  reviewed have a name?

20       A.        It is our payroll system, so it

21  would be all the hours and earnings that

22  are housed within our payroll system for

23  our entire employee population, more

24  specifically California.

25       Q.        What does that Ceridian

                                    Page 19

1   statement have on it, hours worked, how

2   much paid, that sort of thing?

3           MS. SCHUMACHER:  Misstates his

4   testimony.

5       Q.      What does it have?

6       A.      It would have the employee

7   name, address, rate of pay, hours worked,

8   earnings paid, taxes withheld, any

9   voluntary contributions and employee's net

10  pay.

11      Q.      Employee's net pay?

12      A.      Yes.

13      Q.      Did you review those Ceridian

14  documents with respect to the payment that

15  was made to employees?

16      A.      Yes.

17      Q.      Is there a reason that you

18  didn't bring any of those documents with

19  you?

20      A.      Other than the fact that they

21  were already produced to our counsel, no,

22  there was no other reason why I didn't

23  need to bring them, and the fact that I am

24  aware of what's in the document.

25      Q.      So those documents that you

                                    Page 20

EXHIBIT 4 PAGE 3

1   reports for Aeropostale?

2        A.        Yes.

3        Q.        Do you know if these letters

4   that were sent and the spreadsheets and

5   accompanying checks were sent to current

6   employees, former employees, both, or what

7   do you know about that?

8        A.        Can you repeat your question.

9        Q.        The letter and spreadsheet and

10  checks that went out to folks, do you know

11  if the people that were receiving them

12  were only current employees or former

13  employees were receiving them as well?

14       A.        They were only current

15  employees.

16       Q.        Do you know why that was only

17  sent to current employees?

18                 MS. SCHUMACHER:  To the extent

19  that you know because of communications

20  with counsel, it is privileged and I

21  instruct you not to answer.

22       A.        I don't know.

23       Q.        Did you do any calculations for

24  former employees?

25                 MS. SCHUMACHER:  I instruct you

                                      Page 42

EXHIBIT 4 PAGE 4

1    explanation in column 4, do you see that?

2        A.        Yes.

3        Q.        It says "year the adjustment is

4    being made for."

5        A.        Yes.

6        Q.        With respect to the

7    calculations, did you only go back to 2007

8    with respect to calculating the bonus OT?

9        A.        It was only looked for the

10   period in --  yes.

11       Q.        The period of this lawsuit,

12   correct?

13       A.        Yes.

14       Q.        Again looking at No. 6, it says

15   "your current employee status or active,"

16   do you see that?

17       A.        Yes.

18       Q.        Again, you're not aware of any

19   former employees receiving the letter,

20   spreadsheet or a paycheck, correct?

21       A.        No.

22       Q.        The next column says "regular

23   hours worked for the period, i.e., August

24   2007."

25                 Where did you get that number

                                        Page 46

1      Q.      Me and your counsel had a

2   conversation off record regarding the

3   calculations for previously employed,

4   non-currently employed individuals.

5           Did you do any analysis or

6   calculations for former employees of

7   Aeropostale?

8      A.      Yes.

9           MS. SCHUMACHER:  I make my same

10   objection, but he can answer yes or no.

11     A.      Yes.

12     Q.      One followup question; did you

13   pull the same Ceridian information for

14   those people that you did for the

15   currently employed, it came from the same

16   data?

17     A.      Yes.

18           Just as well, I want to clarify

19   something.

20     Q.      Sure.

21     A.      There was a difference between

22   the March 22nd letter and then there was

23   something dated February 27th; the checks

24   were produced, and that's what I wanted to

25   make sure I qualify, the checks were

Page 65

1    produced at the end of February, they were

2    sent out at the end of February.

3                In terms of the date on this

4    letter, it could be like it is an

5    auto-injection or auto-change date within

6    the letter, so every time the letters go

7    to be reprinted, they are reprinted with

8    the most current date.

9        Q.       Did the checks, the letter, the

10   spreadsheet, the explanation sheet, all go

11   out together?

12       A.       Yes.

13       Q.       Still looking at Exhibit 53,

14   this is the spread sleet for associate

15   manager Danielle Ledeker.

16                At the bottom, the totals, it

17   says variance; do you see that last column

18   at the bottom?

19       A.       Yes.

20       Q.       And it says $1,200.14, do you

21   see that?

22       A.       Yes.

23       Q.       What does that number

24   represent?

25       A.       The total amount we paid to

Page 66

EXHIBIT 4 PAGE 7

1     Danielle Ledeker in 2012.

2          Q.          That was for the previously

3     under-compensated bonus OT?

4          A.          That's correct.

5          Q.          Did that amount include any

6     interest?

7          A.          No.

8          Q.          Did that amount include any

9     penalties of any kind?

10         A.          No.

11         Q.          I'm sorry if I asked this

12    already; were you part of the process in

13    determining which employees as a general

14    matter should be receiving this additional

15    check, identifying those individuals, were

16    you part of that process?

17         A.          No.

18         Q.          Do you know who was?

19         A.          I received a list from counsel.

20         Q.          That's fine.

21                     With respect to your

22    calculations of the overtime for people,

23    what were the common characteristics of

24    people that you did the calculations for,

25    were they all managerial employees?

                                        Page 67

EXHIBIT 4 PAGE 8

1      A.      Yes.

2      Q.      They were all people who

3  received a bonus during the period?

4      A.      Yes.

5      Q.      They were all folks who worked

6  overtime during the period?

7      A.      In the periods they worked

8  overtime, yes.

9      Q.      All employees who worked in

10  California?

11      A.      It was specific to the list

12  that I received from counsel.

13      Q.      Do you know why this

14  spreadsheet from Ms. Ledeker ends in June

15  of 2011?

16      A.      Because from June, July 2011,

17  to present day, we use this exact same

18  formula, for --  and it was a period in

19  which we institute the new process.

20      Q.      Beginning in July 2011, you now

21  institute a new process for calculating

22  the bonus overtime?

23      A.      Right, we change to this excel

24  model where we're now including

25  double-time, pretty much revised our excel

Page 68

EXHIBIT 4 PAGE 9

1   model to ensure we capture the information
2   correctly.
3        Q.      And that's for the payment of
4   overtime on bonuses?
5        A.      Yes, bonus overtime, correct.
6        Q.      And that's this new system that
7   you utilize for managers and assistant
8   managers?
9        A.      Correct.
10       Q.      And that occurred, that change
11  occurred beginning in July 2011?
12       A.      July 2011, correct.
13       Q.      With respect to the bonus
14  payable column, going back to that issue
15  again, I know you don't know exactly every
16  type of bonus that you included in that
17  particular category; were there any
18  bonuses that you specifically excluded
19  from that category, like a Christmas bonus
20  or some other type of bonus similar to
21  that?
22       A.      I think for me to answer that
23  question correctly, I would have to go
24  back to the list or at least look at the
25  list of bonus types that California

Page 69

1   was marked for identification, as of this

2   date.)

3                    (Witness perusing document.)

4        Q.        You have seen Exhibit 61

5   before?

6        A.        Yes.

7        Q.        What is Exhibit 61?

8        A.        The employer version of

9   earnings statement.

10       Q.        And this one is for someone

11   identified as store manager, correct?

12       A.        Correct.

13       Q.        Any differences that you can

14   tell from this particular exhibit from the

15   others that we looked at?

16       A.        No; when you speak of anything

17   different, you mean --

18       Q.        In terms of the --  I know the

19   amounts are going to be different, but in

20   terms of the categories provided on the

21   document, they are the same, correct?

22       A.        They are the same.

23       Q.        Do you know why with respect to

24   Ms. Whitright it shows a base rate of

25   $2,000?

Page 84

EXHIBIT 4 PAGE 11

```
 1        A.        She is listed in our system as
 2   a salaried nonexempt employee.
 3        Q.        Both Ms. Spina and Ms. Ledeker
 4   have base rate of it looks like hourly
 5   amounts; are they classified as something
 6   different in the system?
 7        A.        Classified as hourly employees.
 8        Q.        Because Ms. Ledeker and
 9   Ms. Spina are assistant managers?
10        A.        Yes.
11        Q.        And that base rate, is that a
12   monthly amount?
13        A.        It is her biweekly rate.
14        Q.        You said salaried nonexempt,
15   correct?
16        A.        Yes.
17        Q.        Is it accurate to say that all
18   the folks who you calculated this bonus OT
19   for were nonexempt employees?
20        A.        They were all nonexempt
21   employees.
22        Q.        Were there any general managers
23   included in any of your bonus OT
24   calculations?
25        A.        To be completely honest, I
```

Page 85

1    don't know; because I don't look at

2    employee's title per se when I'm

3    calculating anything, it is based on

4    collection of data, what specifically

5    you're looking for and at that point I was

6    not looking at whether or not you were an

7    assistant manager or store manager or

8    general manager, it was irrelevant to my

9    calculation.

10        Q.        You just applied your

11   calculation and treated them all the same?

12        A.        Correct.

13        Q.        Do you know if general managers

14   are classified as nonexempt employees?

15        A.        In California, as far as I

16   know, all employees are listed as

17   nonexempt employees.

18                  MR. BECERRA:   Let's take a --

19        A.        And all store line employees,

20   not just all employees, there are some

21   corporate employees out there as well.

22        Q.        When you say store line

23   employees, employees who are employed in

24   the stores?

25        A.        Correct.

Page 86

EXHIBIT 4 PAGE 13

```
 1       A.      Yes.
 2       Q.      And the Ceridian system is
 3  utilized to create pay stubs?
 4               MS. SCHUMACHER:  Same
 5  objection.
 6       A.      Yes.
 7       Q.      Are you aware of any other
 8  system being utilized with respect to
 9  creating pay stubs for the employees?
10               MS. SCHUMACHER:  Same
11  objections.
12               Can we stipulate for this whole
13  line of questioning that my objections
14  stand.
15               MR. BECERRA:  Yes.
16       A.      No.
17       Q.      The new system of calculating
18  bonus OT that started in July 2011, that's
19  being utilized for all nonexempt employees
20  receiving a bonus?
21       A.      It is being utilized for all
22  eligible employees that would have
23  received a bonus overtime.
24       Q.      What's an eligible employee?
25       A.      Eligible employee being that
```

Page 89

EXHIBIT 4 PAGE 14

1   you're receiving a bonus or you receive a

2   bonus and you work overtime as well, so

3   the two have to be equal in order for the

4   computation to flow into a bonus overtime.

5       Q.      So you receive a bonus, you

6   work overtime, and you're eligible to

7   receive overtime?

8       A.      Yes.

9               MS. SCHUMACHER:   This is just

10  for California, right?

11              THE WITNESS:   Yes, just for

12  California.

13              MR. BECERRA:   Yes.

14      Q.      With respect to the base rate

15  numbers that are identified in the pay

16  stub, we were talking a little about that,

17  that the assistant managers had an hourly

18  rate and they were hourly employees, the

19  store manager that we looked at had a

20  biweekly amount, do you recall that?

21      A.      Yes.

22      Q.      Is that still the way the base

23  rate is identified on pay stubs for those

24  two types of employees?

25      A.      Yes.

Page 90

EXHIBIT 4 PAGE 15

```
 1        C E R T I F I C A T I O N

 2

 3

 4

 5        I, Jineen Pavesi, a Registered

 6    Professional Reporter, Registered Merit

 7    Reporter, Certified Realtime Reporter and

 8    a Notary Public, do hereby certify that

 9    the foregoing witness, RAWLE BOATSWAIN,

10    was duly sworn on the date indicated, and

11    that the foregoing is a true and accurate

12    transcription of my stenographic notes.

13        I further certify that I am not employed

14    by nor related to any party to this

15    action.

16

17

18    Dated:  5/8/12

19

20

21

                        Jineen Pavesi
      ---------------------------------------
22      JINEEN PAVESI, RPR, RMR, CRR

23

24

25

                                    Page 92
```

# EXHIBIT 5

# AÉROPOSTALE

March 22, 2012



Dear Elizabeth:

As you may be aware, in 2011, a former store manager working at an Aéropostale store in California filed a class action lawsuit in the California Superior Court claiming, among other things, that for a period of time, Aéropostale failed to accurately include sales bonuses, when earned, when calculating a manager's overtime. The proposed class includes all Aéropostale California store managers and assistant store managers who were employed with us since March 2007. This lawsuit is in the preliminary stages. The Court has not even yet determined if it is appropriate for this case to proceed as a class action.

Out of an abundance of caution and to defend ourselves, we are in the process of investigating this former store manager's claims. Through this investigation it has come to our attention that overtime pay was potentially under calculated at certain times during your employment with us. The enclosed check and detailed spreadsheet set forth the amount of the adjustment, as well as how it was calculated. This payment does not constitute an admission of liability or of any wrongdoing by Aéropostale.

If you have any questions about this check or the class action lawsuit, please first speak to your district manager, and if necessary, your question will be forwarded to corporate.

Thank you.

Sincerely,

Tanya Bow
Director-Human Resources

PLF/DEF _____
EXHIBIT _5 6_
DATE _5/7/1_ RPTR __
Jineen Pavesi, RPR, RMR, CRR

# EXHIBIT 6

1  Stacey McKee Knight (SBN 181027)
   Rachel C. Schumacher (SBN 235026)
2  Melissa S. Glousman (SBN 252395)
   Christopher E. Carter (SBN 274115)
3  KATTEN MUCHIN ROSENMAN LLP
   2029 Century Park East
4  Suite 2600
   Los Angeles, CA 90067-3012
5  Telephone:  310.788.4400
   Facsimile:  310.788.4471
6
   Attorneys for Defendants AÉROPOSTALE WEST,
7  INC. and AÉROPOSTALE, INC.

8

9                SUPERIOR COURT FOR THE STATE OF CALIFORNIA

10                      FOR COUNTY OF LOS ANGELES

11  LA TINA SANKEY, on behalf of herself and      CASE NO. BC457468
    all others similarly situated,
12                                                 [CLASS ACTION]
                  Plaintiff,
13                                                 DEFENDANTS AÉROPOSTALE, INC.'S
    vs.                                            RESPONSES TO PLAINTIFF LA TINA
14                                                 SANKEY'S SPECIAL
                                                   INTERROGATORIES – SET FOUR
15  AÉROPOSTALE WEST, INC., a Delaware
    corporation, AÉROPOSTALE, INC., a
16  Delaware corporation, and DOES 1 through
    10, inclusive,
17
                  Defendants.
18

19
    PROPOUNDING PARTY:        Plaintiff La Tina Sankey
20
    RESPONDING PARTY:         Defendant Aéropostale, Inc.
21
    SET NUMBER:               Four
22
    ///
23
    ///
24
    ///
25
    ///
26
    ///
27
    ///
28
                                      1
    _____
    31722146_1
                AÉROPOSTALE, INC.'S RESP. TO PLAINTIFF'S SPECIAL INTERROGATORIES – SET 4

EXHIBIT 6 PAGE 1

1  **SPECIAL INTERROGATORY NO. 97:**

2     DESCRIBE in detail what pay code "8C CONT SPEC BON" as noted on YOUR Pay Type

3  Table Report, Bates No. D003043, has been used for during the CLASS PERIOD, including any

4  changes during that time in its usage.

5  **RESPONSE TO SPECIAL INTERROGATORY NO. 97:**

6     Without waiver of the positions set forth in the General Objections, Defendant objects to this

7  Interrogatory to the extent the terms "describe in detail" and "used for" are vague, ambiguous and

8  unintelligible as stated within the context of this Interrogatory.  Defendant objects to the

9  Interrogatory to the extent it seeks information that is neither relevant nor reasonably calculated to

10  lead to the discovery of admissible evidence.  Defendant objects to the Interrogatory to the extent it

11  seeks documents that are privileged by and/or protected from disclosure by the attorney-client

12  privilege and/or the work-product doctrine.  Defendant objects to the Interrogatory to the extent it

13  calls for the production of trade secrets, confidential information and proprietary information

14  regarding Defendant's business and/or business operation.

15     Subject to and without waiving the foregoing objections and General Objections, Defendant

16  responds as follows: The pay code "8C CONT SPEC BON" refers to contest payments paid to store

17  line employees at various times throughout the class period based on the criteria of the specific

18  contest.

19     Because a further response to this request would necessitate the preparing or making of a

20  compilation, abstract, audit or summary of the documents, and the burden would be substantially the

21  same for the propounding party and responding party, Defendant exercises its right under California

22  Code of Civil Procedure section 2030.230 to produce documents in response to this interrogatory.

23  Accordingly, Defendant identifies the MS Access Database, Legal-02-Hours + Earnings TBL,

24  previously produced to Plaintiff in a native format on May 10, 2012 and in PDF format on May 4,

25  2012 as bates number 3966-13623 as well as the contest criteria produced as bates numbers 17797

26  and 17798-17799, as the documents from which a further answer may be derived or ascertained.

27

28

31722146_1

EXHIBIT 6 PAGE 2

1   **SPECIAL INTERROGATORY NO. 99:**

2       DESCRIBE in detail what pay code "8K SHRINK BONUS" as noted on YOUR Pay Type

3   Table Report, Bates No. D003043, has been used for during the CLASS PERIOD, including any

4   changes during that time in its usage.

5   **RESPONSE TO SPECIAL INTERROGATORY NO. 99:**

6       Without waiver of the positions set forth in the General Objections, Defendant objects to this

7   Interrogatory to the extent the terms "describe in detail" and "used for" are vague, ambiguous and

8   unintelligible as stated within the context of this Interrogatory.   Defendant objects to the

9   Interrogatory to the extent it seeks information that is neither relevant nor reasonably calculated to

10  lead to the discovery of admissible evidence. Defendant objects to the Interrogatory to the extent it

11  seeks documents that are privileged by and/or protected from disclosure by the attorney-client

12  privilege and/or the work-product doctrine. Defendant objects to the Interrogatory to the extent it

13  calls for the production of trade secrets, confidential information and proprietary information

14  regarding Defendant's business and/or business operation.

15      Subject to and without waiving the foregoing objections and General Objections, Defendant

16  responds as follows: The pay code "8K SHRINK BONUS" refers to shrink incentive payments made

17  to store line employees throughout the class period based on the criteria set forth in the applicable

18  shrink bonus plans.

19      Because a further response to this request would necessitate the preparing or making of a

20  compilation, abstract, audit or summary of the documents, and the burden would be substantially the

21  same for the propounding party and responding party, Defendant exercises its right under California

22  Code of Civil Procedure section 2030.230 to produce documents in response to this interrogatory.

23  Accordingly, Defendant identifies the MS Access Database, Legal-02-Hours + Earnings TBL,

24  previously produced to Plaintiff in a native format on May 10, 2012 and in PDF format on May 4,

25  2012 as bates number 3966-13623 and the Shrink Bonus Plans which have been produced as Bates

26  Nos. D003044-45; D001751-53; D003046-48; D001754-56; D003049-51; D001757-59; D003052-

27  54; and D002803-05, as the documents from which a further answer may be derived or ascertained.

28

25

AÉROPOSTALE, INC.'S RESP. TO PLAINTIFF'S SPECIAL INTERROGATORIES – SET 4

31722146_1

EXHIBIT 6 PAGE 3

1

**VERIFICATION**

2   STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3        I, Colette Stanford, am the Vice President and Counsel for Aéropostale, Inc. ("Defendant"),

4   and I am authorized to make this verification on Defendant's behalf.  I have read the foregoing

5   Defendant Aéropostale, Inc.'s Responses to Plaintiff's Fourth Set of Special Interrogatories and

6   know their contents.  I am informed and believe that the matters stated herein are true and correct

7   and on that ground allege that the matters stated herein are true.   I swear under penalty of perjury

8   under the laws of the State of California that the foregoing is true and correct and that this

9   Verification was executed on February 6, 2013 at New York, New York.

10

11                                            By: _Colette Stanford_

12                                            Its:  Vice President and Counsel

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 6 PAGE 4

1

## PROOF OF SERVICE

2   STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3       I am employed by Katten Muchin Rosenman LLP in the County of Los Angeles, State of
    California. I am over the age of 18 and not a party to the within action. My business address is
4   2029 Century Park East, Suite 2600, Los Angeles, CA 90067-3012.

5       On February 7, 2013, I served the foregoing documents described as DEFENDANTS
    AÉROPOSTALE, INC.'S RESPONSES TO PLAINTIFF LA TINA SANKEY'S SPECIAL
6   INTERROGATORIES – SET FOUR, as follows:

7

| | | |
|---|---|---|
| 8 | x | by placing the document listed above in sealed envelopes with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth on the attached Service List. |
| 9 | | |
| 10 | | by placing the document listed above in a sealed Overnite Express envelope and affixing a prepaid airbill and causing the envelope to be delivered to an Overnite Express agent for delivery to the persons at the address listed below. |
| 11 | | |
| 12 | | by facsimile transmission on the interested parties in this action at the fax numbers listed on the attached Service List. I received confirmed transmission reports indicating that the document was successfully transmitted. The transmissions were reported as complete and without error. |
| 13 | | |
| 14 | | |
| 15 | | by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below. |

16   Joseph R. Becerra
     Law Offices of Joseph R. Becerra
17   835 Wilshire Blvd., Suite 200
     Los Angeles, CA 90017

18
     Torey Joseph Favarote
19   Attorney at Law
     Gleason & Favarote LLP
20   835 Wilshire Blvd., Suite 200
     Los Angeles, CA 90017

21
        I am readily familiar with the firm's practice of collection and processing correspondence for
22   mailing. Under that practice, the envelope would be deposited with the U.S. Postal Service on that same
     day in the ordinary course of business. I am aware that on motion of the party served, service is presumed
23   invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for
     mailing in affidavit.
24
        I declare under penalty of perjury under the laws of the State of California that the above is true
25   and correct. I further declare that I am employed in the office of a member of the bar of this Court at
     whose direction the service was made.
26
        Executed on February 7, 2013, at Los Angeles, California.
27
28                                                   ANN SHIMA

PROOF OF SERVICE
31608395_299959_00995

EXHIBIT 6 PAGE 5

**PROOF OF SERVICE**

I, Torey J. Favarote, declare:

I am and was at the time of the service mentioned in this declaration, employed in the County of Los Angeles, California. I am over the age of 18 years and not a party to the within action. My business address is Gleason & Favarote, LLP, 835 Wilshire Blvd., Suite 200, Los Angeles, CA 90017.

On March 7, 2013, I served a copy(ies) of the following document(s):

**DECLARATION OF TOREY J. FAVAROTE IN SUPPORT OF PLAINTIFF'S MOTION FOR ORDER GRANTING CONDITIONAL CERTIFICATION OF FLSA COLLECTIVE ACTION AND FOR ORDER REGARDING MAILING OF OPT-IN NOTICE TO FLSA COLLECTIVE ACTION MEMBERS**

on the parties to this action by placing them in a sealed envelope(s) addressed as follows:

| Attorney | Party(ies) Served | Method of Service |
|---|---|---|
| Stacey D. McKee-Knight, Esq.<br>Rachel Schumacher, Esq.<br>Robert J. Dwyer, Esq.<br>Katten Muchin Rosenman, LLP<br>2029 Century Park East, Suite 2600<br>Los Angeles, CA 90067-3012<br>rachel.schumacher@kattenlaw.com<br>stacey.knight@kattenlaw.com<br>robert.dwyer@kattenlaw.com | Counsel for Defendants | CM/ECF SYSTEM |

☐ [BY MAIL] I placed the sealed envelope(s) for collection and mailing by following the ordinary business practice of Gleason & Favarote, LLP, Los Angeles, California. I am readily familiar with Gleason & Favarote, LLP's practice for collecting and processing of correspondence for mailing with the United States Postal Service, said practice being that, in the ordinary course of business, correspondence with postage fully prepaid is deposited with the United States Postal Service the same day as it is placed for collection.

☐ [BY OVERNIGHT COURIER] I caused the sealed envelope(s) to be delivered by a commercial carrier service for overnight delivery to the offices of the addressee(s).

☐ [BY HAND] I directed the sealed envelope(s) to the party(ies) so designated on the service list to be delivered by courier this date.

☐ [BY FACSIMILE TRANSMISSION] I caused said document to be sent by facsimile transmission to the fax number indicated for the party(ies) listed above.

☐ [BY ELECTRONIC TRANSMISSION] I caused said document to be sent by electronic transmission to the e-mail address indicated for the party(ies) listed above.

☒ [BY CM/ECF SYSTEM] I caused the above-referenced document(s) to be sent by electronic transmittal to the Clerk's Office using the CM/ECF System for filing which generated a Notice of Electronic Filing to the CM/ECF registrants in this case.

1

2        I declare under penalty of perjury under the laws of the State of California that the above is

3   true and correct, and that this declaration was executed on March 7, 2013, at Los Angeles, California.

4
                                        /s/ Torey J. Favarote
5                                           Torey J. Favarote

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**