IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PORTIA DANIELS, on behalf of herself and all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>AÉROPOSTALE WEST, INC., a Delaware corporation, AÉROPOSTALE, INC., a Delaware corporation, and DOES 1 through 10, inclusive,<br><br>    Defendants.<br>_____/ | No. C 12-05755 WHA<br><br>**ORDER DENYING MOTION FOR PRELIMINARY APPROVAL OF FLSA COLLECTIVE-ACTION SETTLEMENT AND ORDER TO SHOW CAUSE** |

## INTRODUCTION

In this overtime action, plaintiff's counsel move for preliminary approval of a FLSA collective-action settlement. Plaintiff's counsel propose that the majority of opt-in collective-action members give a release and covenant not to sue to defendants in exchange for zero cash. For the reasons stated herein, preliminary approval is **DENIED**.

## STATEMENT

Defendants Aéropostale West, Inc. and Aéropostale, Inc. are a nationwide retailer of casual apparel and accessories. Currently, there are at least three employment actions pending against defendants: (1) *Sankey v. Aéropostale, Inc.*, No. BC457468 (Los Angeles Sup. Ct. Mar. 16, 2011); (2) *Pakaz, et al. v. Aéropostale West, et al.*, No. BC493736 (Los Angeles Sup. Ct. Oct. 11, 2012); and (3) *Daniels v. Aéropostale West, Inc., et al.*, No. 3:12-cv-05755-WHA (N.D. Cal. Nov. 9, 2012). Plaintiff's counsel in this action are Joseph R. Becerra from the Law Office of Joseph R. Becerra and Torey Joseph Favarote from Gleason & Favarote, LLP, both

located in Los Angeles, California.  Defense counsel are Stacey McKee Knight, Rachel C. Schumacher, and Robert J. Dwyer from Katten Muchin Roseman LLP, located in Los Angeles.

### 1. PROPOSED *SANKEY* SETTLEMENT.

In December 2012, Judge Richard Fruin in Los Angeles Superior Court certified a class of current and former California-based store managers and assistant store managers of Aéropostale from March 16, 2007, to present.  The *Sankey* action involves allegations of failure to pay overtime wages and failure to timely pay wages due, among other claims.  According to the parties in our *Daniels* action, "[o]f the 594 opt ins in this action, 83 are also part of the *Sankey* class."

In March 2014, Judge Fruin granted preliminary approval of the *Sankey* class action settlement.  The proposed *Sankey* settlement "does not release any FLSA claims of any Class Member that opted into" our *Daniels* action.  The total settlement amount is $1.5 million to be paid "to the Settlement Class Members, Plaintiff and Class Counsel . . . and to cover the cost of the Claims Administrator."

The parties represent that the *Sankey* action is currently stayed in light of a petition to the California Court of Appeal for the Second District regarding attorney's fees, possibly due to prior counsel.  Plaintiff's current counsel in *Sankey* are plaintiff's counsel here in *Daniels*.

### 2. PROPOSED *PAKAZ* SETTLEMENT.

Plaintiff's counsel here also represent plaintiff in *Pakaz*.  Before class certification in *Pakaz*, the parties settled on a classwide basis.  In March 2014, Judge John Shepard Wiley, Jr. in Los Angeles Superior Court granted preliminary approval of the proposed *Pakaz* settlement. The proposed settlement defined a vacation class, a rest-period class, and a waiting-time penalties class.  The total settlement amount is $2.1 million to be paid to the settlement class members, plaintiff, plaintiff's counsel, and the claims administrator.  An "amount equivalent to $800,000" of "vacation/personal day credits" will also be restored to defendants' current employees' accounts.  The proposed *Pakaz* release "does not release any FLSA claims of any

2

Class Member that opted into *Daniels*." According to the parties, "[t]here are 113 individuals that are part of *Pakaz* and the [*Daniels* conditionally-certified] collective action here" (Dkt. No. 62).

### 3. THIS ACTION.

In November 2012, through the above-named plaintiff's counsel, Portia Daniels commenced this action alleging that defendants violated the FLSA by failing to include non-discretionary bonus amounts in the pay for non-exempt store employees. No state-law claims were alleged in the complaint. In other words, plaintiff's counsel structured three actions against defendants. The state-law overtime and wage-and-hour claims were filed in *Sankey*, the state-law vacation, rest-period, and waiting-time claims were filed in *Pakaz*, and the FLSA overtime claims were filed here.

In December 2012, a notice reminded the parties that proposed settlements require that counsel perform due diligence to learn the best-case dollar amount of the class claims, including preparation of a final expert class-damages report (Dkt. No. 15). The undersigned judge typically requires a final classwide damages study in sworn form. This is so that the judge can evaluate how good or poor the settlement would be compared to the plaintiff's trial damages claim.

An April 2013 order granted conditional certification of the following FLSA collective action (Dkt. No. 37):

> all current and former employees of Aéropostale classified as non-exempt who have worked overtime for Aéropostale in the United States or Puerto Rico at any time within the last three years — since November 9, 2009 — and received a non-discretionary bonus.

"Opt in notices were sent to all employees that fell within [the] definition," and 594 individuals opted-in (Dkt. Nos. 59). In February 2014, the parties participated in a settlement conference.

On April 24, after the fact and expert discovery deadlines had passed, plaintiff filed the instant motion for preliminary approval of the proposed collective-action settlement. The parties have recently admitted that they "did not exchange trial ready expert damages reports" and did not timely exchange their witness and exhibits lists (Dkt. Nos. 61, 62). There, however, was

3

no reason or order to suspend trial preparation as required by the case management order. Trial is scheduled for June 9, 2014 (Dkt. No. 22).

A May 6 order requested additional information about the proposed settlement. On May 13, the parties filed a response. A May 19 notice identified fundamental problems with the proposed settlement and provided a further opportunity to respond, which the parties did on May 22. This order follows full briefing and oral argument.

## ANALYSIS

"The FLSA establishes federal minimum-wage, maximum-hour, and overtime guarantees that cannot be modified by contract." *Genesis Healthcare Corp. v. Symczyk*, — U.S. —, 133 S. Ct. 1523, 1527–30 (2013). The proposed FLSA settlement must be "a fair and reasonable resolution of a bona fide dispute over FLSA provisions."

Here, there is a bona fide dispute over provisions of the FLSA. A total of 594 opt ins contend that defendants failed to include all non-discretionary bonuses in the regular rate of pay for non-exempt store employees, thereby violating the overtime provisions in the FLSA (Br. 4). Defendants respond that they paid overtime adjustments and "complied at all times with the Fair Labor Standards Act and all applicable state wage-and-hour laws;" any failure to pay was inadvertent and not willful. Defendants also contend that "final collective action certification would be inappropriate and that they would prevail on the merits" (Dkt. No. 52-1 at 8).

The question now is whether the proposed settlement is fair and reasonable. It is not, decidedly not.

***Settlement amount***: Under the proposed "settlement agreement . . . the final 'true up amount' will be determined based on pay data from November 9, 2009 through the date the Court grants preliminary approval" (Dkt. No. 59 at 3). As of May 13, the parties represented that the current "true up amount" was $8,645.61 for all 594 collective-action members. When asked to clarify how many collective-action members would receive zero dollars in exchange for a release, the parties stated (Dkt. No. 59 at 9):

4

    $0 = 60\%$

    $1 to $200 = 38\%$

    $201 to $588 = 2\%$

*In other words, sixty percent of all collective-action opt-in members would give a release and covenant not to sue but would receive absolutely nothing.* To make matters worse, upon further inquiry it turns out that the 38% (in the $1 to $200 category) break down as follows (Dkt. No. 62 at 10):

    $1 to $25 = 78\%$

    $26 to $75 = 15\%$

    $76 to $100 = 3\%$

    $101 to $200 = 4\%$

*This means that the vast majority (ninety percent) of collective-action opt ins would receive nothing or virtually nothing in this proposed settlement but nonetheless would provide a release and covenant not to sue.* No one should have to give a release and covenant not to sue in exchange for zero (or virtually zero) dollars. The collective-action opt ins would be better off simply walking away from this lawsuit with their rights to sue still intact. It is no answer to say they deserve nothing so no harm is done in extracting the release and covenant. The opt ins presumably think they deserve something — otherwise they would not have opted in. To protect the absent opt-in members, they will not be required to give up on their claims in exchange for zero dollars.

   The record is also barren of evidentiary or expert support showing how this proposed settlement could possibly be fair. All we have are two declarations from plaintiff's counsel themselves stating that "[u]nder the proposed settlement, the Collective Action Members (totaling approximately 594 former and current employees) will receive 100% of the amount that each Member is owed" (Favarote Decl. ¶ 6, Becerra Decl. ¶ 4). *These are not FRCP 26(a)(2)(B) expert reports*.

   For their part, defendants submitted a five-page declaration by Elaine Reardon, dated

5

May 12, 2014. (Note, the motion for preliminary approval was filed on April 24 and the expert discovery deadline was earlier, meaning the expert calculations should already have been done (and available to supply to the Court) but were not.) The Reardon declaration is not a FRCP 26(a)(2)(B) expert report. This is mere after-the-fact advocacy in support of the proposed settlement. When counsel were provided one last chance to bring forward their trial-ready damages reports, the parties finally admitted they had none.

Counsel offer the excuse that they negotiated the "settlement framework" in a vacuum, without information about the actual settlement amount. "[A]t the time of the agreement, Plaintiff and Defendants were both *blind to the exposure*," they say, "but knew . . . that the specific amount would be nominal, *which it is undisputed[ly] it is*" (Dkt. No. 62 at 2) (emphasis added). When plaintiff's counsel were asked to candidly state how much they would ask a jury to award, they were unable to do so. Plaintiff's counsel instead vaguely stated that (Dkt. No. 59 at 3–4) (emphasis added):

> If this matter was to proceed to trial, Collective Action Counsel would seek the current $8,654.21 true up amount *plus any overtime due on additional nondiscretionary bonus payments made through trial* . . . . Collective Action Counsel with [sic] also *ask the jury to award liquidated damages equal to the amount of unpaid overtime*, which Collective Action Counsel acknowledges will be difficult to establish.

This is not specific information about the total triable damages amount based on reasonable diligence and sworn testimony. To protect the absent opt-in members, it is critical to know the total triable amount so that the judge can evaluate the fairness and reasonableness of the proposed settlement. Plaintiff's counsel also failed to provide any specific information about overtime hours worked and non-discretionary bonuses paid. *See also McKeen-Chaplin v. Franklin Am. Mortgage Co.*, No. 4:10-cv-05243-SBA, 2012 WL 6629608, at *3 (N.D. Cal. Dec. 19, 2012) (Judge Saundra Brown Armstrong) (denying approval of proposed FLSA settlement). *It is thus virtually impossible to evaluate how much, if any, plaintiff's counsel have left on the settlement table, but it is almost certain that the true settlement value for 594 opt ins would exceed $8,654.21. If not, the opt ins would be better off walking away from this lawsuit with their rights to sue intact.*

6

*Release*: The proposed release would be overbroad. Counsel were authorized to settle only the conditionally-certified FLSA claim, but the proposed release would go far beyond the FLSA claim. "Settled Claims" would be defined as follows (Dkt. No. 52-1 at 3–4):

> all claims, known or unknown, based on the alleged facts arising out of or relating to the facts alleged in the operative complaint in the Collective Action. Notwithstanding the foregoing, nothing contained herein shall be interpreted as the release of any claims that the Settlement Collective Action Members have under state or federal law for the failure to pay overtime based on theories not alleged in the case, including but not limited to those based upon an improper fluctuating workweek.

The release would be (*id*. at 9, 11–12) (emphasis added):

> Each Settlement Collective Action Member shall be deemed to have released and forever discharged the Released Parties from any and all Settled Claims.
>
> \*          \*          \*
>
> Notwithstanding any other provisions of this Settlement Agreement, *this Agreement is intended by the Parties to be a release and a covenant not to sue as to the Settlement Collective Action Members, which extinguishes all Settled Claims*. This Agreement precludes any attempt by the Settlement Collective Action Members to file or continue prosecution of a lawsuit, or otherwise pursue an individual claim for relief with any local, state, or federal agency or court against the Released Parties with respect to their respective Settled Claims . . . . With respect to the Settled Claims only, Settlement Collective Action Members stipulate and agree that . . . they shall be deemed to have . . . expressly waived and relinquished, to the fullest extent permitted by law, the provisions, rights and benefits of Section 1542 of the California Civil Code, *or any other similar provision under federal or state law*, which provides:
>
> > A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.
>
> *Settlement Collective Action Members may hereafter discover facts in addition to or different from those they now know or believe to be true with respect to the Settled Claims, but* upon the entry of Order of Final Approval and Final Judgment, *they shall be deemed to have, and . . . shall have, fully, finally, and forever settled and released any and all of the Settled Claims, whether known or unknown, suspected or unsuspected, contingent or non-contingent, which now exist, or heretofore have existed*.

Since no opt-in member should be giving a general release (and should only be giving a specific release limited to the FLSA claim), why would counsel work in the provision about Section 1542

7

and general releases? And, the italicized language is indicative of a much broader release and covenant than the FLSA limits of this case.

*Additional release*: The proposed settlement would also insulate "defendants . . . the Released Parties, Representative Plaintiff, other Settlement Collective Action Members, Collective Action Counsel, Defendants' Counsel, [and] the Claims Administrator" from "any claim . . . based on distributions or payments made in accordance with this Settlement Agreement." The parties fail to explain or justify why this additional release is fair and reasonable. (This release also would not be disclosed in the proposed notice.)

This takes the cake. Not only would most opt ins receive nothing at all, or in some cases, virtually nothing at all, but absent opt ins could not go after their counsel for malpractice in foisting this deal upon them. This exacerbates the conflict of interest set forth below.

*Gag-order*: The proposed settlement would also provide that any collective-action member "may dispute the amount of the Settlement Award by filling out and returning the Claim Form, along with all documentation evidencing that the amount of the Settlement Award is incorrect . . . [by] (45) days from the date of mailing of the Collective Action Notice." If there is an undisputed error, the settlement amount would be adjusted. If the parties dispute the error, the collective-action member "may exclude themselves from this Settlement Agreement or object." The parties and counsel, however, cannot "seek to solicit or otherwise encourage Collective Action Members" to submit objections, exclusion requests, or appeals (Dkt. No. 52-1 at 15, 20). In other words, there would be a gag-order.

If plaintiff's counsel are not permitted to aid their clients, to whom they owe fiduciary duties, in submitting objections or exclusion requests, it may be unduly burdensome for individual collective-action members to navigate the procedures on their own. It is also disturbing that plaintiff's counsel could be prohibited from vigorously advocating in the best interests of their clients, the individual collective-action members. No justification is provided for the fairness and reasonableness of this provision.

*Conflict of interest*: Counsel have a conflict of interest. Plaintiff's counsel simultaneously represent the *Daniels* collective-action members, the *Sankey* class, and the

8

proposed *Pakaz* settlement class in three actions against defendants. All three actions involve labor-and-employment claims. The Supreme Court has warned of the problems with an attorney who currently represents another class against the same defendant. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999). This is because defendants have an incentive to settle all claims at once, if it settles at all, thereby creating opportunities for counsel to manipulate the allocation of settlement dollars to the detriment of absent class members. Here, the same plaintiff's counsel settled all three actions within months.

Even plaintiff's counsel admit that there is a "potential portion of overlap" among the actions and, indeed, there are 83 persons in *Sankey* and 113 persons in *Pakaz* who are collective-action members here. Moreover, when asked what, if anything, would remain of this action if the *Sankey* and *Pakaz* actions proceeded to judgment, defendants replied: "Defendants contend that for the 83 members of *Sankey* that are also members of this collective action, a portion of the recovery they obtain in *Sankey*, whether by settlement or through favorable judgment, *should offset any recovery here*" (Dkt. No. 62 at 10) (emphasis added). Counsel for plaintiff's response to their conflict of interest was that "[d]efendants do not currently dispute Plaintiff's ability to represent the plaintiffs in these actions." This response is ridiculous, missing the point entirely, for in a collusive deal the defense would be the last to criticize the deal or to criticize counsel for plaintiff.

*Cy pres*: In light of the foregoing fundamental problems with the proposed settlement, it is unnecessary for this order to address the appropriateness of the *cy pres* to the Public Justice of Oakland, California.

*Notice*: The parties have submitted a fourteen-page proposed notice, four-page claim form, and one-page objection form, all chock-full of legalese. The proposed notice would not plainly lay out the salient points. The format would be oppressive to the average person. Instead of disclosing up-front the amount each collective-action member would receive (for example, zero dollars in most cases), the proposed notice would say (on pages 4 and 5):

> The parties have agreed to make a "true up" payment ("Settlement Amount") to all Settlement Collective Action Members, as follows: From November 9, 2009 to the date of preliminary approval of this settlement, for each instance in which a Settlement Collective

9

> Action Member: (i) received a sales, shrink, contest, retention, referral, Puerto Rico Christmas Bonus, or gross up payment ("applicable code" payment), (ii) worked overtime in the period in which the applicable code payment was earned, (iii) did not receive an accurate overtime adjustment for the applicable code payment, he/she shall receive an accurate overtime adjustment. Plaintiff's counsel, an expert retained by Plaintiff's counsel, and Defendants' counsel agree that the Settlement Award to each Collective Action Member represents, to their best understanding, at least 100% of the amount that each Collective Action Member is owed, if anything, due to the alleged failure to include the above noticed non-discretionary bonuses into the calculation of the regular rate of pay for purposes of determining the correct overtime compensation owed to each Collective Action Member.

Buried on page 3 of a separate exhibit (Exhibit B) would be the "individualized notice of settlement award," which would supposedly disclose the zero settlement amount. Exhibit A, however, would state that the "exact amount to be paid to you and every other Settlement Class member will be calculated after the deadline for submitting Claim Forms and analyzing all disputes as to the Settlement Amount are resolved." Nowhere would the notice say that ninety percent of all opt ins would receive nothing or virtually nothing.

The proposed notice would also lull the collective-action members into believing that plaintiff's counsel would protect their interests. The notice would state that "[i]f counsel for the Parties do not agree on the correct amount of the Settlement Award, they may seek appropriate relief or guidance from the Court." But given the gag-order, the true burden would be on the individual collective-action members to exclude themselves, dispute the recovery amount, or object within 45 days of the mailing of the notice.

Specifically, collective-action members would need to return the four-page "Claim, Waiver, and Release Form" within 45 days of the mailing of the notice in order to challenge the recovery. If a notice is returned as undeliverable and is eventually mailed to a second address, the objection and request for exclusion deadlines *would not be extended*, according to the proposed settlement. This means that those collective-action members would have even less time to prepare their objections, dispute erroneous calculations, or request to be excluded from the proposed settlement.

For those who would receive money under the proposed settlement, the procedure is onerous. If there is a dispute as to the amount, collective-action members would be expected to

10

dispute the amount within 45 days of the mailing of the notice (with no extensions). The short timeline and the oppressive notice and claim form would deter collective-action members from challenging or disputing what little money they would receive under the proposed settlement.

Also, the proposed release would be buried on page 8 of the proposed notice. The covenant not to sue would not be clearly laid out. Busy collective-action members should not have to hunt around to decipher what claims they would be releasing under the proposed settlement. This order highlights some of the notable problems with the proposed notice but does not identify every deficiency because of the fundamental problems with the proposed settlement itself.

*Incentive Award*: Even though sixty percent of the collective-action members would receive nothing and another thirty percent would receive virtually nothing, named plaintiff Portia Daniels brazenly seeks $5,000 as an incentive award to be paid separately by defendants on top of the proposed settlement amount. Recall, the total proposed settlement amount (as of May 13) is $8,645.61. This is an excessive request for someone who has done nothing in this action except to foist a terrible settlement on the people she claims to represent. The request for $5,000 as an incentive award is **DENIED**.

*Attorney's Fees*: The proposed settlement does not provide for attorney's fees. Instead, "[c]ounsel will separately file a properly-noticed motion for reasonable attorney's fees or costs." Plaintiff's counsel state that "none of such costs will be paid out of the Collective Action Member's recovery, but instead will be paid separately by Defendants." It is premature to address attorney's fees because preliminary approval of this proposed settlement is **DENIED**.

## ORDER TO SHOW CAUSE

This settlement is so unfair, it cannot be fixed. The Court is tentatively convinced that the opt ins would be better off fending for themselves and escaping the negotiating authority of plaintiff's counsel. Therefore, preliminary approval of the proposed settlement is **DENIED**. Counsel are ordered to show cause (i) why the conditional FLSA certification should not be vacated, (ii) why plaintiff's counsel should not be required to notify all opt ins by letter of the decertification and the specific reasons therefor (costs borne by plaintiff's counsel), and (iii) why

11

this case should not go to trial on **AUGUST 18** on the named plaintiff's claim only (the original trial date of June 9 is now too immediate to be practical), with a final pretrial conference on **AUGUST 13 AT 2:00 P.M.** Any submissions on this order to show cause must be filed on or before **JUNE 10, 2014 AT NOON**. All counsel are further ordered to promptly submit copies of this order to the judges presiding over the *Sankey* and *Pakaz* actions and to do so by Monday, June 2, 2014.

**IT IS SO ORDERED.**

Dated: May 29, 2014.


WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California